[No. C045357. Third Dist. Aug. 31, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN KEOVILAYPHONE, Defendant and Appellant.

[CERTIFIED FOR PARTIAL PUBLICATION*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I., III., IV. and V. of the Discussion.

## COUNSEL

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Charles A. French and Michael P. Farrell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BUTZ, J.**—A jury convicted defendant John Keovilayphone of rape in concert (Pen. Code, §§ 264.1, 261, subd. (a)(2)[1]—count I), sexual penetration in concert (§§ 264.1, 289, subd. (a)(1)—count II), simple assault (§ 240—count III, lesser included offense), and sexual penetration with a foreign object (§ 289, subd. (a)(1)—count VI). With respect to the first two counts, the jury made special findings that defendant kidnapped the victim and that her movement substantially increased the risk of harm. (§ 667.61, subds. (d)(2) & (e)(1).)

Sentenced to state prison for 25 years to life plus 17 years, defendant seeks reversal on four grounds: (1) the trial judge's failure to provide sufficient guidance in response to a juror inquiry about the definition of rape; (2) error in instructing the jury that rape in concert was a general intent crime; (3) refusal to give a requested jury instruction on the lesser included offense of attempted rape; and (4) refusal to instruct the jury that absence of flight immediately after the crime could be considered evidence of innocence. We find none of these grounds meritorious and shall affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

Nkau X. (Nkau) and the victim T.T. (T.) live in Oroville and are high-school-age cousins. On March 14, 2003, Nkau and her friend, Ker, invited T., who was then 15 years old, to a birthday party in Marysville. The two girls traveled there with Ker and his friend Meng. The birthday party was being held for Meng's brother, Mong, in a detached garage at their residence. A third brother, Keng, was also there.

The cousins arrived at the party around 6:00 p.m. There were about 10 to 15 people in attendance. At some point, defendant, a friend of Meng's who was nicknamed "Blacky," arrived. Defendant is Laotian, and had darker skin than the other partygoers, who were all Hmong. He also stood out on account of his large size.

During the party, T. asked defendant what time it was because she noticed that he was the only one there wearing a watch.

Beer and hard liquor were served at the party. T. did not want to drink alcohol, but was told that she would not be taken home unless she did. She drank about two "pretty big" cups half-filled with hard liquor. Everyone at the party was inside the garage except Mong and Nkau. T. felt sick and began throwing up, at which point several males, including defendant and Meng, grabbed her from behind. Someone turned off one of the lights while Meng and defendant tried to insert their fingers in her vagina. Defendant put his finger inside her vagina, ignoring her pleas for him to stop. T. knew it was defendant because she "could feel his watch against [her] skin." He removed his hand from her pants when she vomited again.

T. found her way outside and told Nkau what had happened, but Nkau thought she was joking and wandered off. While T. was outside by the refrigerator talking to Ker, defendant kept coming over to them. Defendant said he wanted to rape T. and asked Ker to "[l]et me just have her for ten minutes." Ker initially told defendant "no," but they began whispering to each other for a minute or two.

Suddenly, Keng and Ker grabbed T. by the arms and legs. With defendant leading the way, they physically carried her to another location in the back of the property near some trees. T. was placed in a shed, on a flat surface with no lighting. Ker and Keng held T. down, Ker covered her mouth to stifle her screams, and defendant began removing her pants. Defendant put his fingers in her vagina; he then held T.'s legs down and inserted his penis in her vagina. Meng heard screams coming from the shed and the attack ended

when he arrived, told the assailants to stop and announced that he was taking T. home. The entire ordeal had lasted about 30 minutes.

As they were preparing to leave, T., who was crying and upset, told Nkau that "Blacky" had raped her. Nkau went over to defendant, who was sitting in a car, and called him a "bitch" because he had no right to do that to her cousin. Defendant asked Nkau what she had called him. When she repeated the epithet, he got out of the car and struck her above her left eye with his fist.

T. rode back to Oroville with defendant, Meng, Mong and Ker. When she arrived at Nkau's house, she reported the rape to her friend, Cindy, and they called the police and T. was taken to the hospital. The investigating police officer noticed that T. had bruising and reddish marks on her wrists, armpits and upper body. David Damazo, the doctor who examined T. that night, observed that she had been through a "traumatic ordeal." It looked to him as though T. had "clamped [her] legs very tightly together trying to prevent what was happening." There were two lacerations of the skin of the vagina and the tissue was red, raw and abraded. Her condition was inconsistent with consensual intercourse, and Dr. Damazo indicated it was in fact "among the worst [he had] seen as far as the amount of vaginal injury during a sexual assault exam."

Defendant did not testify. Other witnesses who attended the party, some of whom testified under grants of use immunity, presented varying and somewhat conflicting accounts of the events that evening.

## DISCUSSION

### I. Response to Juror Inquiry*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. Instruction on Mental State Required for Rape in Concert

As defendant concedes, rape (§ 261) is a general intent crime. (*People v. Linwood* (2003) 105 Cal.App.4th 59, 70 [129 Cal.Rptr.2d 73].) However, defendant was charged with the more serious crime of rape in concert (§§ 264.1, 261, subd. (a)(2)).

---

*See footnote, *ante*, page 491.

Defendant complains that the court misinstructed the jury by telling them that the crime of rape in concert required only general intent.[2] He maintains that, because the offense requires that defendant commit rape "voluntarily" while acting in concert with others, the intent required is a "very similar type of specific intent to that required for aiding and abetting" and thus rape in concert is a *specific* intent crime.

■ There are two kinds of criminal intent: general intent and specific intent. " 'When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.' (*People v. Hood* (1969) 1 Cal.3d 444, 456–457 [82 Cal.Rptr. 618, 462 P.2d 370].) General criminal intent thus requires no further mental state beyond willing commission of the act proscribed by law." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 [81 Cal.Rptr.2d 835, 970 P.2d 409].)

■ In order to be found guilty of the crime of rape in concert, a defendant must "voluntarily acting in concert with another person," commit the crime of rape "by force or violence and against the will of the victim." (§ 264.1.) He may do so "either personally or by aiding and abetting the other person." (*Ibid.*)

The word "voluntarily" in section 264.1 means that the defendant acted freely of his own volition, and not accidentally, unintentionally or out of fear or coercion. (Cf. *People v. Caldwell* (1984) 153 Cal.App.3d 947, 951–952 [200 Cal.Rptr. 508].) This mental state typifies general intent crimes. (See *People v. Lyons* (1991) 235 Cal.App.3d 1456, 1460 [1 Cal.Rptr.2d 763] ["If the end in view is simply a proscribed act we ordinarily call that a general intent"]; *People v. Johnson* (1998) 67 Cal.App.4th 67, 72 [78 Cal.Rptr.2d 795] ["The only intent required for a general intent offense is the purpose or willingness to do the act or omission"].)

It follows that as long as the defendant acts (1) voluntarily and (2) in concert with others in committing an act of sexual intercourse against the victim's will by using force or violence, the elements of section 264.1 have

---

[2] As pertinent here, the court told the jury: "In the crime[] rape in concert, . . . there must exist a union or joint operation of act or conduct *and general criminal intent*. [¶] General criminal intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent even though he may not know that his act or conduct is unlawful." (Italics added.)

been satisfied. It is not necessary that he intend to do any further act or achieve any additional consequence. Rape in concert is, therefore, a general intent crime.

■ It is true that rape in concert can be committed by two different *methods*: either by personal commission *or* by aiding and abetting the perpetrator. With respect to the one who personally does the raping, the requisite mental state is one of general intent: the intent to rape in volitional cooperation with others.

Since defendant was prosecuted for violating section 264.1 on the theory that he was the sole rapist, it is undeniable that under these facts he was accused of a general intent crime.

As to those who may be held liable for the crime of rape in concert through the alternative method of aiding and abetting, the jury must, of course, find that they had the *specific intent* to aid the perpetrator, i.e., had knowledge of his criminal purpose as well as an intent to encourage, facilitate or instigate commission of the offense. (*People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].)[3] But "aiding and abetting" is merely a theory upon which a person may be held accountable for an offense committed by another. (See § 31; 2 LaFave, Substantive Criminal Law (2d ed. 2003) Acts & Mental State, § 13.2, p. 337.) It does not define a substantive crime. (See *People v. Fraize* (1995) 36 Cal.App.4th 1722, 1725 [43 Cal.Rptr.2d 64] ["[U]nder an aiding and abetting theory . . . [,] a defendant can properly be convicted of a crime even though by statutory definition the defendant would be incapable of committing the substantive offense by himself"].)

■ The fact that a person must harbor a specific intent to aid the rapist in order to be convicted as an accomplice to a charge of violating section 264.1 does not transform the underlying offense into a specific intent crime. Defendant's confusing attempt to engraft a mental state applicable to a *theory of criminal liability* onto the substantive crime of rape in concert must be rejected.

### III.–V.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[3] The jurors here were separately instructed on the concept of aiding and abetting not because defendant was prosecuted on that theory, but because some of the witnesses who testified against him could be considered accomplices, and thus the court was required to inform the jury that their testimony needed corroboration (CALJIC No. 3.10) and should be viewed with caution (CALJIC No. 3.18).

[*]See footnote, *ante*, page 491.

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Davis, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 14, 2005.