Filed 10/3/14

# CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B250069 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA121201) |
| v. | |
| MARCUS TREVELLE WHITE et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge. Affirmed as modified and remanded with directions.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant, Marcus Trevelle White.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant, Dimitri Devon Gales.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts A and C through F of the Discussion.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In the underlying action, juries found appellant Dimitri Devon Gales guilty of attempted voluntary manslaughter and shooting at an inhabited dwelling, and appellant Marcus Trevelle White guilty of possession of a firearm by a felon and shooting at an inhabited dwelling. Appellants contend their convictions must be reversed due to the erroneous admission of evidence, insufficiency of the evidence, and instructional error; in addition, they request that we independently review the transcript of an in camera hearing before the trial court, and that we correct an error in the determination of their custody credits. Respondent acknowledges an error in the custody credit determination, and further maintains that the trial court failed to impose certain mandatory fees.

In the published portion of this opinion, we reject Gales's contention there is insufficient evidence to support his conviction for shooting at an inhabited dwelling (Pen. Code, § 246),[1] concluding that an aider and abettor of that offense need not know of, or share, the perpetrator's specific intent to shoot at an inhabited dwelling, even when the perpetrator has such an intent. In the unpublished portions of the opinion, we reject appellants' remaining contentions regarding the admission of evidence, the sufficiency of the evidence, and instructional error, and upon an independent review of the in camera hearing,

_____

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

2

ascertain no improperly withheld evidence.  We nonetheless conclude appellants' sentences contain errors, and modify the judgments to correct them.

## RELEVANT PROCEDURAL HISTORY

On August 24, 2012, a four-count amended information was filed, charging appellants in counts 1 and 2 with the attempted willful, deliberate, and premeditated murder of Luiz Diaz and Jason Ayala (§§ 187, subd. (a), 664), and in count 3 with shooting at an inhabited dwelling (§ 246.).  In count 4, the amended information charged appellant White with possession of a firearm by a felon (§ 12021, subd. (a)(1)).  Each count contained allegations that appellants committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)), and that appellant White had suffered a prior conviction, for purposes of the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).  In addition, accompanying counts 1 through 3 were gun use allegations (§§ 12022.5, 12022.53, subds. (b), (c), (d)).  Appellants pleaded not guilty and denied the special allegations.

The trial was conducted before two juries, one for each appellant.  Gales's jury found him guilty as charged in count 3 (shooting at an inhabited dwelling).  Regarding counts 1 and 2, his jury found him guilty only of attempted voluntary manslaughter relating to Diaz, as a lesser included offense of count 1.  Gales's jury also found that his crimes were committed for the benefit of a criminal street gang, and that in connection with the offense of attempted voluntary manslaughter, a principal personally discharged a firearm causing great bodily injury.  White's jury found him guilty as charged in count 3 (shooting at an inhabited dwelling) and count 4 (possession of a firearm by a felon), and not guilty with respect to the

remaining counts. White's jury further found that he personally used a firearm in committing the offense charged in count 3.

During the trial, White waived trial by jury on the prior conviction allegation, and admitted the prior conviction when he testified. Following the juries' verdicts, the trial court permitted the prosecutor to file a second amended information alleging that White had suffered a prior conviction for a serious felony (§ 667, subd. (a)(1)).[2] After White denied that allegation, the court found the prior felony conviction allegations against White to be true. The court sentenced Gales to a total term of 18 years to life, and White to a total term of 20 years and four months. These appeals followed.

## FACTS

A. *Prosecution Evidence*

1. *Events Surrounding Shooting*

Luis Diaz testified that in December 2011, he belonged to a gang called the "Compton T-Flats," and his nickname was "Dopey." His friend, Jason Ayala, was a member of a different gang known as Primera Flats. According to Diaz, the Tree Top Piru gang was a rival gang.

Diaz further testified that on December 8, 2011, at approximately 2:26 p.m., he and Jason Ayala were standing in front of an apartment building on Elm Street in Compton. Appellants walked up to Diaz and Ayala, and Gales asked Diaz, "Are you Dopey from TF?" After Diaz replied in the affirmative, White pulled out a

---

[2] In permitting the filing of the second amended information, the trial court determined that White had admitted the prior conviction when he testified at trial, and that White later stipulated to the existence of the conviction. On appeal, White has not challenged the filing of the second amended information.

gun, pointed it at Diaz, and asked, "What that Tree Top life be like?" As White began shooting, Diaz and Ayala ran down the driveway adjoining the apartment building. Diaz then jumped over a wall bordering the driveway. As soon as Ayala rejoined him, Ayala told Diaz that Diaz had been shot. Diaz discovered he was bleeding from a wound in his right arm. When Los Angeles County Sheriff's Department deputy sheriffs arrived, Diaz described the assailants to them.

Alice R. Corona and her daughter testified that on December 8, 2011, they were driving out of the driveway of an apartment building on Elm when they heard a shout. Down the street they saw two Black men chasing two Hispanic men. They also heard shooting. Neither Alice Corona nor her daughter identified appellants as the two Black men, but the former stated that she saw one of the Black men in a "pointing" stance, and later stated that the taller of the two Black men held a gun. Evidence was presented that Gales is six feet, two inches tall, and White is five feet, eight inches tall.

Jason Ayala did not testify at trial. Following an Evidence Code section 402 hearing, the trial court permitted Los Angeles County Sheriff's Department Deputy Sheriff Edgar Solano to testify regarding Ayala's statements shortly after the shooting. According to Solano, on December 8, 2011, he and his partner responded to a call regarding that incident. They were flagged down at the scene by Ayala who, appearing nervous and very excited, told the officers, "they shot my friend." Behind Ayala, Deputy Solano saw Diaz, lying on the ground, bleeding profusely from an apparent gunshot wound. Ayala stated that he and Diaz were approached by two Black men, one of whom asked Diaz, "Are you Dopey from T-Flats?" Ayala heard three or four gunshots. In describing the two men, Ayala said the shooter wore a white T-shirt.

Los Angeles County Sheriff's Department Deputy Sheriff John Orozco testified that on December 8, 2011, while on patrol, he received radio communications regarding the shooting. As he searched the area for suspects, a security guard flagged him down, and reported seeing two Black men running in the direction of a shopping center. At the shopping center, Orozco saw appellants and followed them. When they neared a store's entrance, Orozco tried to detain them at gunpoint. As he approached White and Gales, they fled in different directions. Orozco chased White, who threw a handgun onto the roof of a building, stopped, and put his hands up.[3]

Los Angeles County Sheriff's Department Deputy Sheriff Allison Holland testified that she and her partner responded to Deputy Sheriff Orozco's calls for assistance. They soon arrested Gales near the shopping center.

Deputy Sheriff Solano testified that approximately five minutes after broadcasting Ayala's description of the assailants, he drove Ayala to the shopping center area for field identification show-ups. Ayala viewed White and Gales and identified them as the two men who had approached Diaz. According to Solano, White was wearing a white T-shirt.

---

[3] A video recording of the events at the shopping center from a security camera was played for the jury. In addition, Los Angeles County Sheriff's Department Deputy Sheriff Braulio De La Torre testified that after Orozco requested assistance, he drove to the shopping center, where he saw White throw the gun onto the rooftop. Deputy Sheriff De La Torre later retrieved the gun.

## 2. *Subsequent Investigation*

Diaz was treated for a gunshot wound to his right arm. When presented with photographic six-pack lineups, Diaz identified White as an assailant, stating, "That's him," and "Looks like the one that shot."[4]

Altagracia Venegas testified that she owned the apartment building where the shooting took place, as well as a smaller building at the end of the latter apartment building's driveway. Luis Badilloa rented the apartment in the smaller building. On December 8, 2011, after the shooting, Venegas visited Badilloa and saw bullet holes in the wall of Badilloa's apartment. According to Venegas, the holes were not present before the shooting.

Investigating officers found three bullet impact points in the exterior wall of Badilloa's apartment, and recovered three bullets. They later determined that the three bullets were fired from the handgun retrieved from the roof of the shopping center. In addition, gunshot residue was found on both appellants.

Los Angeles County Sheriff's Department Detective Richard Sanchez and Deputy Sheriff Nina Gonzales interviewed White. White initially asserted that he was not present at the shooting, and that no gun residue would be detected on him. According to White, he was walking alone when someone gave him a gun and told him to hold it. White also said that a "Tree Top" had threatened to beat him up unless he performed a shooting.

Later in the interview, White stated that while he and someone else were walking, two "Mexicans" confronted them and said, "Fuck niggas." White's

---

[4] Although Diaz testified at trial that Gales was one of the two men who approached him, Diaz did not identify Gales after the shooting when presented with a photographic six-pack lineup containing Gales's photo. Diaz then told the investigating officers, "I was too busy looking at the other guy who pulled the gun on me."

companion handed him a gun, stating, "Here, do your dirt." Rather than shooting at the "Mexicans," White permitted them to flee, and fired three shots without hitting anyone. White and his companion then ran to the shopping center. White's companion held the gun, but gave it back to White when the police appeared. After an officer directed White to "[g]et down," White threw the gun away.

Near the end of the interview, White provided another account of the shooting. According to White, after his companion fired two shots at the "Mexicans," he handed the gun to White and said, "Here, you do it." When the "Mexicans" had left, White fired a single shot "the other way" so that he could say, "At least I did the shooting."[5]

### 3. *Gang Evidence*

Los Angeles County Sheriff's Department Deputy Sheriff Eric Gomez, a gang expert, testified that the Tree Top Piru street gang claims a territory within Compton.[6] The Tree Top Piru gang's primary activities include murder, assault with a deadly weapon, robbery, and the sale of narcotics. One of their most important rivals is a Hispanic gang known as the Compton Varrio Tortilla Flats, whose claimed territory overlaps areas of Compton, including the location of the underlying offenses.

According to Deputy Sheriff Gomez, the Tree Top Piru gang has 122 documented members, including 95 primary members, that is, individuals who

---

[5] The jury heard an audio recording of the interview, and a transcript of the interview was admitted into evidence.

[6] Gomez referred to the gang as the "Tree Top Piru Blood" gang and the "Tree Top Piru" gang. For simplicity, we refer to it using the latter term.

have been "jumped into" the gang, and for whom it is "family." Members earn respect by "putting in work," which involves committing violent acts. In 2010, Gales was arrested for gang loitering, and admitted he was a member of the Tree Top Piru gang. White also had told a detective that he belonged to the gang. Gomez further opined that the crimes charged against appellants were committed for the benefit of that criminal street gang.

B. *Defense Evidence*

    1. *White's Evidence*

White, who testified on his own behalf, stated that he had a prior felony conviction for robbery.[7] According to White, prior to the date of the shooting, the Tree Top Piru gang repeatedly pressured him to join that gang, but he refused. Shortly before the shooting, a gang member told White the harassment would stop if he committed a crime for the gang. White said he did not want to do so.

White further testified that on the date of the shooting, he encountered Gales, whom he knew to be a member of the Tree Top Piru gang. As they walked together, Diaz and another Hispanic man approached and asked, "Where are you from?" When White and Gales tried to walk away, White heard the men say, "T-Flat gang. Fuck niggers." White saw Diaz reach toward his waistband and withdraw something black.

White further testified that he and Gales began to run away. As they did so, White heard gunshots. Gales pulled out a gun, and White heard more gunshots. When White saw Gales's gun, he stopped running. Gales handed the gun to White and said, "Go get them." White saw Diaz and his companion running away. After

---

[7]    White also stipulated to the existence of the conviction.

9

Diaz ran down a driveway and around a corner, White fired the gun three times at the wall of a nearby house. White fired the gun in the hope that the Tree Top Pirus would stop asking him to commit crimes, and without an intent to injure anyone.

White further testified that he and Gales ran to the shopping center, where he threw away the gun before his arrest. During his interview with Detective Sanchez and Deputy Sheriff Gonzales, he initially lied regarding the shooting because he was afraid to be labeled as a snitch. Later, after the preliminary hearing, he was placed in a holding cell with Gales, who accused him of being a snitch and punched him before deputy sheriffs intervened.

### 2. *Gales's Evidence*

Gales testified that he was an "inactive" member of the Tree Top Piru gang, and that White also belonged to that gang. According to Gales, White earned income by selling crack from a location known as the "Sugar Shack."

Gales further testified that on December 8, 2011, he was walking to a location to play basketball when he met White. As they walked together, Gales saw Diaz and Ayala, and heard Diaz yell, "T-Flats. Fuck Niggas." When gunshots rang out, Gales began to run, leaving White. Gales did not see White fire a gun, and he did not fire a gun himself or chase Diaz and Ayala

Gales further testified that he ran directly to a park, where he stopped for about a minute. After Gales left the park, he saw White in a shopping center and talked to him regarding the incident. When Deputy Sheriff Orzoco directed them to stop, Gales continued to walk because he was in shock. When he saw Deputy Sheriff Holland's patrol car, he decided to walk to it. Later, after the preliminary hearing, Gales punched White while they were in the holding cell because White had lied regarding Gales's role in the shooting.

10

C. *Rebuttal*

Deputy Sheriff Gomez testified that the Sugar Shack was a location where illegal narcotics sales occurred and Tree Top Piru gang members congregated. In addition, Michael Contreras, White's former parole officer, testified that White's records showed that he had claimed gang membership.

## DISCUSSION

Appellants contend that the trial court erred in admitting Ayala's remarks and field identifications following the shooting, that there is insufficient evidence to support Gales's conviction for shooting at an inhabited dwelling and the gang enhancement regarding that conviction, that there was instructional error, that the sentence imposed on White's conviction for possession of a firearm by a felon contravened section 654, and that the trial court incorrectly determined their custody credits.[8] Appellants also ask us to review the transcript of an in camera hearing conducted by the trial court. Respondent contends the court failed to impose certain mandatory assessments. As explained below, our independent review of the in camera hearing has revealed no potential issues or errors, and we otherwise discern no error, with the exception of certain sentencing defects that we may properly correct without a remand for resentencing.

A. *Admission of Ayala's Remarks and Field Identifications*

White contends the admission of Deputy Sheriff Solano's testimony regarding Ayala's postshooting remarks and field identifications contravened his

---

[8] Appellants have joined in each other's contentions, to the extent they are applicable to both appellants.

11

right of confrontation under the Sixth Amendment of the United States Constitution.[9] We disagree.

In *Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*), the United States Supreme Court held that the admission of "'testimonial'" out-of-court statements is barred by the confrontation clause of the Sixth Amendment unless the witness is available and the defendant had a prior opportunity to cross-examine the witness. The court declined to provide a full definition of the term "testimonial," but offered the following explanatory remarks: "'Testimony[]' . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Id.* at p. 51.)

In *Davis v. Washington* (2006) 547 U.S. 813, 822, the United States Supreme Court clarified that statements to police officers in the course of an "emergency" may not be testimonial. The court explained: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Ibid.*)

In *Michigan v. Bryant* (2011) ___ U.S. ___, ___ [131 S.Ct. 1143, 1155], the United States Supreme Court elaborated: "The basic purpose of the Confrontation Clause was to 'targe[t]' the sort of 'abuses' exemplified at the notorious treason

---

[9]     Gales has forfeited his contention of error regarding Solano's testimony, as his counsel withdrew his objection to that testimony before the trial court.

12

trial of Sir Walter Raleigh. [Citation.] Thus, the most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial. [Citation.] . . . When . . . the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the Clause."

An instructive application of these principles is found in *People v. Romero* (2008) 44 Cal.4th 386 (*Romero*). There, during the penalty phase of the trial, the trial court permitted a police officer to testify regarding a deceased victim's remarks and field identification following the defendant's attack on him. (*Id*. at pp. 420-421.) After the court overruled a defense hearsay objection, the officer testified that when he and his partner responded to a call, the victim ran to them, yelling and upset. (*Id*. at p. 421.) The victim stated that when he discovered two men engaging in vandalism, one of them attacked him with an ax, hitting the victim's finger. (*Ibid*.) The victim further stated that after he retrieved a gun and confronted the men, they fled. (*Ibid*.) Soon afterward, investigating officers found the defendant and his companion hiding in some bushes near the scene of the attack. They also found that the defendant had an ax. (*Ibid*.) The victim was transported to their location, where he identified them as his attackers. (*Ibid*.) According to the testifying officer, approximately five minutes elapsed between his first encounter with the victim and the victim's identification of the defendant. (*Ibid*.)

Our Supreme Court concluded that the officer's testimony did not violate the defendant's constitutional right to confront adverse witnesses: "[The officer], responding to an emergency call, encountered an agitated victim of a serious assault, who described defendant's attack on him with a small ax. The statements

provided the police with information necessary for them to assess and deal with the situation, including taking steps to evaluate potential threats to others by the perpetrators, and to apprehend the perpetrators. The statements were not made primarily for the purpose of producing evidence for a later trial and thus were not testimonial. The same is true of the statements pertaining to identification. The primary purpose of the police in asking [the] victim . . . to identify whether the detained individuals were the perpetrators, an identification made within five minutes of the arrival of the police, was to determine whether the perpetrators had been apprehended and the emergency situation had ended or whether the perpetrators were still at large so as to pose an immediate threat." (*Romero*, *supra*, 44 Cal.4th at p. 422.)

We reach the same conclusion here. When the prosecutor offered to present Solano's testimony relating to Ayala, White's counsel objected that it fell outside the hearsay exception for "excited utterances" (Evid. Code, § 1240), and contravened White's right of confrontation.[10] The trial court conducted a hearing under Evidence Code section 402, during which Solano testified that he and his partner were three blocks away from the location of the shooting when they heard the initial radio call regarding it. In two minutes, they arrived at the scene of the shooting, where Ayala waved them down. Ayala was pacing back and forth, and appeared to be nervous and excited. He then described the shooting and the two men who initiated it. After some five minutes, Solano learned that two suspects had been detained approximately a quarter of a mile away, and he drove Ayala to

---

[10] Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

14

their locations for field identification show-ups. On the way to those locations, Ayala was still nervous and excited. When Ayala viewed White and Gales, he identified them as the two men who had approached Diaz.

Following the hearing, the trial court ruled that Deputy Sheriff Solano's testimony was admissible over White's objections. We discern no error in that ruling. In view of *Romero*, Solano's testimony did not contravene White's Sixth Amendment right of confrontation. Furthermore, the record amply supports the court's determination that Ayala's statements to Solano were admissible over a hearsay objection as spontaneous statements. (*People v. Stanphill* (2009) 170 Cal.App.4th 61, 74-75 [victim's description of attack to officers and identification of assailant were properly admitted under Evidence Code section 1240, as they were made shortly after attack, while victim was upset].)[11]

White's reliance on *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 and *Bullcoming v. New Mexico* (2011) ___ U.S. ___ [131 S.Ct. 2705] is misplaced. In each decision, the United States Supreme Court held that laboratory reports prepared for use in criminal litigation constituted testimonial out-of-court

---

[11] In his reply brief, White argues for the first time that Ayala's purpose was not to assist police in apprehending a dangerous assailant, but to "further[] the cause of his gang." However, at the Evidence Code section 402 hearing, White neither raised this argument nor identified evidence supporting it. Furthermore, as noted above, the evidence presented at the hearing abundantly supports the trial court's determination that Ayala's statements to Solano were the product of excitement, rather than reflection, for purposes of the spontaneous declaration exception to the hearsay rule. (*People v. Phillips* (2000) 22 Cal.4th 226, 235-236 [trial court's factual findings regarding the admissibility of remarks under the spontaneous statement exception are reviewed for the existence of substantial evidence].) As White's argument is based on his speculative characterization of Ayala's intent, we reject it. (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1467.)

statements under the rule stated in *Crawford*. (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at p. 310; *Bullcoming v. New Mexico*, *supra*, 131 S.Ct. at pp. 2716-2717.) As explained above, nothing before us suggests that Ayala's post-shooting statements and field identifications were made for use in criminal litigation. In sum, the trial court did not err in admitting Solano's testimony.[12]

B. *Sufficiency of the Evidence*

Gales contends there is insufficient evidence to support his conviction for shooting at an inhabited dwelling and the accompanying gang enhancement. For the reasons set forth below, we reject his contention.[13]

---

[12] Even if the admission of Solano's testimony had violated *Crawford*, we would find that testimony to be harmless under the beyond-a-reasonable-doubt test for federal constitutional error (*People v. Song* (2004) 124 Cal.App.4th 973, 985). White testified that he was a felon, and that during the incident, he intentionally fired a gun three times at nearby house. In view of that testimony and the other evidence properly admitted at trial, we conclude White could not have achieved a more favorable outcome had Solano's testimony been excluded.

[13] "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

1. *Shooting at an Inhabited Dwelling*

We begin with Gales's challenge to his conviction for shooting at an inhabited dwelling. Section 246 provides that "[a]ny person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house [or] occupied building . . . is guilty of a felony." Gales's challenge hinges on the fact that although White testified that he intentionally shot three times at the exterior wall of a house, Gales's own jury did not find that Gales personally used a gun in the commission of the crime of shooting at an inhabited dwelling. Gales thus maintains that his liability for that crime must rely on a determination that he was an aider and abettor.

The crux of Gales's contention is that there is no evidence that he possessed the state of mind required of an aider and abettor for shooting at an inhabited dwelling. Gales observes that according to White's testimony, when Gales handed White the gun and said, "Go get them," White decided to fire three shots at a neighboring house, rather than try to injure the fleeing Diaz. Gales argues there is no evidence that he shared "White's last minute decision to shoot at an inhabited building." He further argues that to be an aider and abettor, he "had to *know* that White intended to shoot the building." Gales's arguments thus rely on a key premise, namely, that to aid and abet White's crime, Gales had to know of, and share, White's particular intent, that is, to shoot at the building. As explained below, because that premise is false, Gales's arguments fail.

Generally, "[t]here are two kinds of criminal intent: general intent and specific intent. '"When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition

17

refs to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." [Citation.] General criminal intent thus requires no further mental state beyond willing commission of the act proscribed by law.' [Citation.]" (*People v. Keovilayphone* (2005) 132 Cal.App.4th 491, 496.)

Shooting at an inhabited dwelling, as established by section 246, is a general intent crime. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 (*Mendoza*); *People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1500 (*Hernandez*); *People v. Overman* (2005) 126 Cal.App.4th 1344, 1356 (*Overman*).) As explained in *Overman*, "section 246 is not limited to the act of shooting directly 'at' an inhabited or occupied target. Rather, the act of shooting 'at' a proscribed target is also committed when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it." (*Overman*, at p. 1356.) Thus, "[s]ection 246 does not require a specific intent "'to do a further act or achieve a future consequence'" beyond the proscribed act of shooting 'at' an occupied building or other proscribed target. [Citation.] In other words, the statute does not require a specific intent to achieve a particular result (e.g., strike an inhabited or occupied target, kill or injure). [Citation.] Instead, the statute only requires a shooting under facts or circumstances that indicate a conscious disregard for the probability that one of these results will occur." (*Id.* at p. 1357.)

A defendant may be liable for shooting at an inhabited dwelling as an aider and abettor. (*Mendoza*, *supra*, 18 Cal.4th at p. 1123; *In re Jose D.* (1990) 219 Cal.App.3d 582, 585.) Generally, to be convicted under an aiding-and-abetting theory, a defendant must "act with knowledge of the criminal purpose of

18

the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" (*People v. Beeman* (1984) 35 Cal.3d 547, 560, italics omitted.) Thus, "[*a*]*wareness* of the direct perpetrator's purpose is critical for the alleged aider and abettor to be culpable for that perpetrator's act." (*Mendoza*, *supra*, 18 Cal.4th at p. 1129.) Furthermore, to be culpable, an aider and abettor must have a specific intent that encompasses more than his or her own conduct: "an aider and abettor must intend not only the act of encouraging and facilitating but also the *additional* criminal act the perpetrator commits." (*Ibid*.)

Aiding-and-abetting liability takes two forms. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) "First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault." (*Ibid*.) Here, the trial court instructed Gales's jury only regarding the first form of aider-and-abettor liability. We therefore confine our discussion to the state of mind required for this form of liability. (*Ibid*.)

"[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator." (*McCoy*, *supra*, 25 Cal.4th at p. 1118.) If the offense charged is a so-called "specific intent" crime, the accomplice must share the perpetrator's specific intent. (*Ibid*.) In contrast, if the charged offense is a so-called general intent crime, the

19

aider and abettor need only knowingly and intentionally facilitate the direct perpetrator's commission of the crime, without intending some additional result or consequence not required for the crime. (See *Hernandez*, *supra*, 181 Cal.App.4th at pp. 1498-1502; *People v. Keovilayphone*, *supra*, 132 Cal.App.4th at p. 496.) As noted in *Keovilayphone*, the fact that an aider and abettor must harbor a specific intent to aid the direct perpetrator of general intent crime "does not transform the underlying offense into a specific intent crime." (*People v. Keovilayphone*, at p. 497.)

An instructive application of the principle regarding general intent crimes is found in *Hernandez*. There, a gang member drove a car while a fellow gang member in the car fired a gun at three people. (*Hernandez, supra,* 181 Cal.App.4th at p. 1498.) The driver was charged with discharging a firearm at a person from a motor vehicle (§ 12034, subd. (c)), and tried as an aider and abettor. (*Hernandez*, at pp. 1498-1499.) At trial, the jury was instructed that the offense, as a general intent crime, was committed by the passenger if he willfully and maliciously fired the gun and shot it at someone not in the car; in addition, the jury received instructions on the driver's potential liability as an aider and abettor. (*Ibid*.)

Following the driver's conviction, he contended that to show his culpability as an aider and abettor, the prosecution was obliged to prove that he aided his passenger with the intent to shoot at another person, but the instructions improperly permitted the jury to convict him without finding that he possessed that intent. (*Hernandez*, *supra*, 181 Cal.App.4th at p. 1499.) The crux of his argument was that the instructions allowed the jury to determine that he was an aider and abettor without finding (1) that the passenger intended to shoot *at someone* and (2) that the driver shared this intent. (*Ibid*.) In rejecting the contention, the

20

appellate court reasoned that the charged offense, as a general intent crime, required only the willful firing of a gun that manifested a conscious indifference to the probability that the bullets would fly toward or near a person; no specific intent to target or hit a person was necessary. (*Id*. at pp. 1500-1501.) Hence, the driver could be convicted as an aider and abettor, regardless of whether the passenger intended to shoot someone or whether the driver shared that intent. (*Id*. at pp. 1501-1502.)

In view of *Hernandez*, we reject the key premise of Gales's contention. Although White may have had the specific intent to fire the gun at the building, that particular intent was not, in fact, required for White's commission of the crime: as explained above, White's state of mind was sufficient for the crime, provided that he intentionally fired the gun "in such close proximity to the target that he show[ed] a conscious indifference to the probable consequence that one or more bullets w[ould] strike the target." (*Overman*, *supra*, 126 Cal.App.4th at p. 1356.) For that reason, Gales's status as an aider and abettor was not dependent on whether he knew of, or shared, White's particular intent to shoot at the building. Rather, under the circumstances presented here, to establish Gales's status as an aider and abettor, it was sufficient to demonstrate that Gales knowingly and intentionally encouraged White to shoot the gun under circumstances showing that Gales -- like White -- was consciously indifferent to the probable consequence that the bullets would strike the building.

There is ample evidence that Gales acted with the state of mind required for an aider and abettor. The existence of the requisite knowledge may be established by circumstantial evidence. (*People v. Long* (1970) 7 Cal.App.3d 586, 591.) Similarly, the existence of the requisite intent may be shown by "an act which has the effect of giving aid and encouragement, and which is done with knowledge of

21

the criminal purpose of the [perpetrator] aided." (*People v. Beeman*, *supra*, 35 Cal.3d at p. 559.)

Here, Diaz testified that he fled from Gales and White down a driveway. According to Venegas, the driveway terminated at the apartment building inhabited by Badilloa. Alice Corona's daughter stated that the taller of the two Black men she saw -- that is, Gales -- held a gun. As Gales acknowledges, White testified that Gales handed him a gun and urged him to shoot Diaz, who was running down the driveway; in addition, White testified that he fired three times at a nearby house. Evidence was presented that three bullet impacts were found in the exterior of Badilloa's apartment building. In view of this evidence, Gales's jury could reasonably conclude that Badilloa's apartment building was visible to Gales when he urged White to shoot Diaz, who was running toward that building. Accordingly, the evidence described above was sufficient to establish that Gales aided and abetted shooting at an inhabited dwelling.[14]

The decisions upon which Gales relies are distinguishable. In *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, 1338, overruled on another ground in *Santamaria v. Horsley* (9th Cir. 1998) 133 F.3d 1242, 1248, the defendant, a gang

---

[14] Gales suggests that no reliance may be placed on White's testimony regarding the circumstances surrounding the shooting. However, under the principles governing review for the existence of substantial evidence, the testimony of a witness is ordinarily sufficient to uphold a judgment "even if it is contradicted by other evidence, inconsistent or false as to other portions. [Citations.]" (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 366.) The circumstances in which an appellate court may properly decline to credit testimony are exceptional and rare. (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728-732.) "'Testimony may be rejected only when it is inherently improbable or incredible, i.e., "'unbelievable per se,'" physically impossible or "'wholly unacceptable to reasonable minds.'"' [Citation.]" (*Id*. at p. 729, quoting *Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065.) Those circumstances are not present here.

member, was involved in a fistfight with members of a rival gang. Later, the defendant was in a car occupied by fellow gang members. (*Mitchell v. Prunty, supra,* 107 F.3d at p. 1338.) Someone in the car fired a gun, injuring one of the defendant's assailants during the fistfight. (*Id.* at. p. 1339.) When hostilities continued, the injured rival gang member suffered another gunshot injury, and a car containing the defendant ran over and killed him. (*Ibid.*) The Ninth Circuit held there was insufficient evidence to support the defendant's conviction for murder as an aider and abettor, as the jury found that the defendant had not driven the car responsible for the gang member's death, and there was otherwise no evidence that he encouraged or assisted either the shootings or the fatal car collision. (*Id.* at pp. 1340-1343.) Here, in contrast, there was evidence that Gales handed White a gun and urged him to shoot Diaz, who was running toward Badilloa's apartment building.

In *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262, 1266-1267, a juvenile and his brother, both gang members, lived in a trailer park. After two rival gang members fired guns at their home, the juvenile's brother fatally shot one and wounded the other while the juvenile was present. (*Ibid.*) The juvenile made no gestures, and offered no assistance or encouragement to his brother. (*Ibid.*) The Ninth Circuit concluded that the juvenile's murder conviction failed for want of evidence that he aided and abetted his brother's crimes. Here, in contrast, it was Gales himself who handed White the gun and directed him to shoot. In sum, there is sufficient evidence that Gales possessed the state of mind required of an aider and abettor for shooting at an inhabited dwelling

   2. *Gang Enhancement*

   Gales contends the gang enhancement regarding his conviction for shooting

at an inhabited dwelling fails for want of sufficient evidence. Section 186.22, subdivision (b)(1), provides a sentence enhancement for a defendant convicted "of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." Gales's challenge to the gang enhancement relies on the same argument as his challenge to the underlying conviction: he maintains there is insufficient evidence that he possessed the specific intent required for the gang enhancement because "the prosecution failed to prove that [he] knew that White would shoot at a[n] inhabited building."

The defect in Gales's challenge to the underlying conviction is also fatal to his challenge to the gang enhancement. Generally, the "[c]ommission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime." (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.) In view of the testimony from the gang expert and Gales himself, there is sufficient evidence that Gales and White belonged to the Tree Top Piru gang. According to Diaz, Gales initiated the incident by asking Diaz, "Are you Dopey from TF?" Furthermore, for the reasons discussed above (see pt. B.1., *ante*), the evidence at trial showed that Gales acted in concert with White, as it established that Gales aided and abetted White's offense of shooting at an inhabited dwelling. Accordingly, there is sufficient evidence to support the gang enhancement.

C. *No Duty to Instruct on Lesser Included Offense*

Appellants contend the trial court erred in failing to instruct the jury sua sponte on grossly negligent discharge of a firearm under section 246.3, which is a

24

lesser included offence of shooting at an inhabited dwelling (section 246), as charged in count 3. (*Overman*, *supra*, 126 Cal.App.4th at p. 1358). Generally, the trial court is obligated to instruct on lesser included offenses which the evidence tends to prove. (*People v. St. Martin* (1970) 1 Cal.3d 524, 532-533.) It is under no such obligation if there is no evidence of a lesser included offense (*People v. Breverman* (1998) 19 Cal.4th 142, 154), or if the pertinent evidence is "minimal and insubstantial" (*People v. Springfield* (1993) 13 Cal.App.4th 1674, 1680). As we explain below, there is insufficient evidence to support an instruction regarding grossly negligent discharge of a firearm.

Subdivision (a) of section 246.3 states: "Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense." In *People v. Ramirez* (2009) 45 Cal.4th 980, 985 (*Ramirez*), our Supreme Court discussed whether that offense is a lesser included offense of the offense established in section 246. The court observed that "'[s]ection 246.3 was enacted primarily to deter the dangerous practice . . . of discharging firearms into the air in celebration of festive occasions.'" (*Ramirez,* at p. 987, quoting *People v. Robertson* (2004) 34 Cal.4th 156, 167, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1200.) In view of the legislative intent underlying section 246.3, the court determined that to establish a violation of that statute, the prosecution need not identify any particular person actually in danger of death or injury from the grossly negligent shooting. (*Ramirez*, at p. 990.)

The court concluded: "[S]ection 246.3(a) is a necessarily included lesser offense of section 246. Both offenses require that the defendant willfully fire a gun. Although the mens rea requirements are somewhat differently described, both are general intent crimes. The high probability of human death or personal

25

injury in section 246 is *similar to*, although *greater than*, the formulation of likelihood in section 246.3(a), which requires that injury or death 'could result.' The *only other difference* between the two, and the basis for the more serious treatment of a section 246 offense, is that the greater offense requires that an inhabited dwelling or other specified object *be within the defendant's firing range*." (*Ramirez*, *supra*, 45 Cal.4th at p. 990, italics added.)[15]

Here, the juries received evidence supporting only two versions of shooting at an inhabited dwelling, neither of which mandated instructions on grossly negligent discharge of a firearm as a lesser included offense. According to the prosecution's evidence, appellants pursued Diaz and fired a gun at him as he ran

---

[15]     *Ramirez* governs our discussion regarding whether the trial court was obliged to instruct on grossly negligent discharge of a firearm, even though that decision concerns a different issue, namely, whether a defendant can be convicted of both shooting at an inhabited dwelling and grossly negligent discharge of a firearm. (*Ramirez*, *supra*, 45 Cal.4th at p. 985.) For purposes of the rule requiring instructions on lesser included offenses, courts ordinarily look first to the so-called "accusatory pleading" test, which "looks to whether ""the charging allegations of the accusatory pleading include language describing the [charged] offense in such a way that if committed as specified [the proposed] lesser [included] offense is necessarily committed.""" (*People v. Montoya* (2004) 33 Cal.4th 1031, 1035, quoting *People v. Lopez* (1998) 19 Cal.4th 282, 288-289.) In certain other contexts, courts apply the "elements" test to decide whether an offense is necessarily included within a charged offense. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227-1228.) "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former." (*Id*. at p. 1227.) That test is usually employed in determining whether a defendant may be convicted of multiple charged crimes. (*Id*. at p. 1231.) Nonetheless, *both* tests identify lesser included crimes, for purposes of the trial court's duty to instruct sua sponte on a lesser included crime. (*People v. Smith* (2013) 57 Cal.4th 232, 240.) As the second amended information contains no pertinent allegations, the elements test is dispositive here.

down the driveway toward Badilloa's apartment building. Regarding this version of the underlying events, Diaz testified that he fled from appellants down the driveway when White began shooting the gun; in addition, the Coronas testified that they saw two Black men chasing two Hispanic men when they heard shots. That testimony, coupled with the evidence that Badilloa's apartment building was plainly visible at the end of the driveway and that three bullets hit it, precluded any rational inference that Badilloa's apartment building was not within appellants' "firing range," or that the requisite "high probability" of death or injury was not present. (*Ramirez*, *supra*, 45 Cal.4th at p. 990.)

The same is true regarding White's account of the offense charged in count 3. On that account, when Gales handed White a gun and urged him to fire at Diaz, who was fleeing down the driveway, White fired three bullets at a nearby "house," which the evidence unequivocally demonstrated to be inhabited. White's account thus foreclosed any rational inference that the "house" was not within appellants' "firing range," or that the requisite "high probability" of death or injury was not present.

Appellants maintain that an instruction on grossly negligent discharge of a firearm was required because their juries reasonably could have found that White fired the gun without intending to harm anyone; in addition, Gales suggests that White was merely grossly negligent because his actions presented only "a significant risk that personal injury or death would result." We reject their arguments. As explained above (see pt. B.1., *ante*), the offense of shooting at an inhabited dwelling does not require an intent to harm anyone; furthermore, under the circumstances present here, the "significant risk" of personal injury or death that Gales acknowledges cannot reasonably be distinguished from that required for shooting at an inhabited dwelling. In sum, no instruction was required regarding

grossly negligent discharge of a firearm as a lesser included offense of shooting at an inhabited dwelling.

D. *Section 654*

White contends that section 654 bars separate punishments for shooting at an inhabited dwelling (count 3) and possession of a firearm by a felon (count 4). As explained below, he is mistaken.

Subdivision (a) of section 654 prohibits multiple punishment for "[a]n act or omission that is punishable in different ways by different provisions of law . . . ." Generally, when several counts are properly subject to section 654, a court must identify the count carrying the longest sentence, including enhancements, and stay the sentence imposed under the other pertinent counts. (*People v. Kramer* (2002) 29 Cal.4th 720, 722.) However, multiple punishment is proper if the defendant pursues suitably independent criminal objectives. (*People v. Williams* (1992) 9 Cal.App.4th 1465, 1473-1474.) "Whether the defendant held 'multiple criminal objectives is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it.' [Citations.]" (*People v. Galvan* (1986) 187 Cal.App.3d 1205, 1218.)

When the pertinent offenses implicate a course of conduct, the application of section 654 is subject to the test stated in *Neal v. State of California* (1960) 55 Cal.2d 11, 19 (*Neal*), overruled in part in *People v. Correa* (2012) 54 Cal.4th 331, 334: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal*, at p. 19.) Under the *Neal* test, "if the offenses were independent of

and not merely incidental to each other, the defendant may be punished separately even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. [Citations.] If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one. [Citation.]" (*People v. Green* (1996) 50 Cal.App.4th 1076, 1084-1085.)

Under these principles, section 654 does not bar separate punishment for a gun-related crime and possession of a firearm by a felon when the evidence shows that the felon separately possessed the gun before or after committing the gun-related crime. In *People v. Jones* (2002) 103 Cal.App.4th 1139 (*Jones*), the defendant, who had been convicted of a felony, drove past the home of an ex-girlfriend and fired several gunshots at it. (*Id.* at pp. 1141-1142.) A jury subsequently found him guilty of shooting at an inhabited dwelling and possession of a firearm as a felon. (*Id.* at p. 1142.) On appeal, the defendant contended that the trial court had improperly failed to stay punishment under section 654 for the latter offense, arguing that his possession of the gun was incidental to and simultaneous with his shooting at his ex-girlfriend's home. (*Jones*, *supra*, at p. 1142.) Following an examination of case authority, the court disagreed, holding that "section 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm." (*Id.* at p. 1145.)

The *Jones* court relied in part on *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1404-1405 (*Ratcliff*), in which a felon used a gun to commit two robberies, and was still in possession of the gun when he was arrested 30 minutes after the second robbery. On appeal, he argued that punishment for his conviction for possession of a gun as a felon should have been stayed because a gun-related

punishment had been imposed in connection with his robbery convictions. (*Id*. at pp. 1405-1407.) The court affirmed his sentence, concluding that the weight of then-extant case authority established that multiple punishments for possession of a gun by a felon is impermissible solely when "fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense." (*Id*. at p. 1412.) The court rejected a small number of cases that suggested a contrary determination. (*Id*. at pp. 1411-1413.)

*Jones* and *Ratcliff* are applicable here. In rejecting White's contention under section 654, the trial court concluded that separate punishment was permissible for counts 3 and 4 because White chose to retain the firearm when he believed himself to be safe from arrest for the shooting. The court stated: "[W]e have evidence that the gun was presented to Mr. White[, that] it was fired at the house, [and that] he ran away. We have [a] video of them walking away [at the shopping center]. They don't believe the police are chasing them, at that time, at the market, [when they are] walking away. Also all of a sudden, when the police come[], he runs and throws it. He is definitely in possession of that gun during the time . . . they think they are safe . . . , as they are walking in front of the market." We see no error in that determination.

*People v. Bradford* (1976) 17 Cal.3d 8 (*Bradford*), *People v. Venegas* (1970) 10 Cal.App.3d 814 (*Venegas*), and *People v. Lopez* (2004) 119 Cal.App.4th 132 (*Lopez*), upon which White relies, are distinguishable. In *Bradford*, the defendant and his accomplice robbed a bank and then drove away. (*Bradford*, *supra*, 17 Cal.3d at p. 13.) Minutes later, when a police officer stopped them for speeding, the defendant seized the officer's gun, shot at him, and drove away. (*Ibid*.) As police officers pursued the defendant and his accomplice, the latter fired several gunshots at the officers. (*Ibid*.) The chase ended only when the

30

defendant was involved in a traffic accident.  (*Ibid*.)  Our Supreme Court concluded that under section 654, the defendant's assault with a deadly weapon and possession of a firearm by a felon constituted an indivisible course of action, stating that separate punishment is impermissible when "the evidence shows a possession *only* in conjunction with the primary offense."  (*Bradford*, at p. 22, italics added.)  Here, in contrast, substantial evidence supports the trial court's finding that White's possession of the gun as a felon was divisible from the shooting, as White elected to retain the gun upon concluding he was safe from arrest.

In *Venegas*, the evidence at trial showed only that during an altercation in a bar, the defendant shot his victim with a gun he obtained from the victim, and then abandoned the gun before fleeing the bar.  (*Venegas*, *supra*, 10 Cal.App.3d at pp. 817- 820.)  In view of that evidence, the appellate court held that section 654 precluded separate punishment for assault with a deadly weapon and possession of a firearm by a felon, reasoning that the defendant's possession of the gun was "physically simultaneous" to the shooting and "incidental to only one objective, namely, to shoot [the victim]."  (*Venegas,* at p. 821.)  As explained above, those circumstances are not present here.

In *Lopez*, the defendant possessed a loaded gun, and was convicted of possession of a firearm by a felon and unlawful possession of ammunition.  (*Lopez*, *supra*, 119 Cal.App.4th at pp. 134-135.)  The appellate court held that section 654 barred separate punishments for the offenses, concluding that the defendant's intent in possessing the gun could not be separated from his intent in possessing the ammunition.  (*Lopez*, at pp. 138-139.)  That is not the case here.  In sum, separate punishments were properly imposed on White's convictions for

shooting at an inhabited dwelling (count 3) and possession of a firearm by a felon (count 4).

### E. *In Camera Hearing*

At appellants' request, we have examined the transcript of the court's in camera hearing, and determined that it raises no potential errors or issues.

### F. *Custody Credits and Mandatory Assessments*

Appellants contend the trial court miscalculated their presentence custody credits. The trial court awarded each appellant custody credits totaling 641 days. They argue that they are entitled to credit for an additional day of actual custody. Respondent agrees. We conclude that appellants' custody credits must be corrected to reflect custody credits totaling 642 days.

Respondent contends the trial court failed to impose certain mandatory fees in sentencing appellant. Section 1465.8, subdivision (a), provides that a $40 court operations assessment "shall be imposed" on every conviction for a criminal offense. Similarly, Government Code section 70373 provides that a $30 court construction fee "shall be imposed" on every conviction for a criminal offense. At the sentencing hearing, the trial court imposed only a single $40 court operations assessment and a single $30 court construction fee in connection with each appellant, although each was convicted on two counts. As the court was required to impose the fees upon sentencing appellants, the judgment regarding each appellant must be modified to include an additional $40 court operations assessment and an additional $30 court construction fee. (*People v. Schoeb* (2005) 132 Cal.App.4th 861, 866; *People v. Lopez* (2010) 188 Cal.App.4th 474, 480.)

32

## DISPOSITION

The judgments are modified to reflect that each appellant is entitled to custody credits totaling 642 days, and is subject to court operations assessments totaling $80 (§ 1465.8, subd. (a)) and court construction fees totaling $60 (Gov. Code, § 70373).  The trial court is directed to correct the sentencing minute order for each appellant to reflect the modifications stated above, to prepare amended abstracts of judgment reflecting those modifications, and to forward the amended abstracts to the Department of Corrections and Rehabilitation.  In all other respects, the judgments are affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION.**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

COLLINS, J.

33