Filed 8/30/21  B.R. v. Superior Court CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION FOUR

| | |
|---|---|
| B.R.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>        Respondent.<br><br>JUDITH R., a Minor, et al.,<br><br>        Real Parties in Interest. | B310686<br><br>(Los Angeles County Super. Ct. No. 18LJJP00806A) |

ORIGINAL PROCEEDING in mandate.  Stephanie Davis, Judge Pro Tempore.  Petition denied.

Los Angeles Dependency Lawyers, Law Office of Jolene Metzger, Dominika Campbell, and Sergio Quijano for Petitioner.

Children's Law Center of Los Angeles-1, Ann-Marissa Cook, and Sooyun Myoung, for Minor and Real Party in Interest.

No appearance by Respondent.

_____

## INTRODUCTION

At a 12-month review hearing held in February 2021, the juvenile court determined that releasing minor Judith R. (born December 2006) to the custody of petitioner-father B.R. would result in a substantial risk of physical detriment to her, because she had claimed she would kill herself if returned to his custody. The court terminated Father's reunification services and set a permanency planning hearing under Welfare and Institutions Code section 366.26.[1] Father timely challenged this order via a writ petition for extraordinary relief, and we issued an order to show cause why the petition should not be granted and stayed the hearing. While Judith has filed an answer to the petition, Los Angeles County Department of Children and Family Services (DCFS) declined to do so.

_____

[1] Undesignated references are to the Welfare and Institutions Code.

In his petition, Father argues the court erred in finding detriment because: (a) based on her history of contradictory statements and "manufactured threats and episodes," Judith's statements were not credible; (b) Judith's ability to receive the same services she was currently receiving would have adequately protected her if the court had returned her to Father's custody; (c) DCFS's "objective assessment tool" found no safety concerns in returning Judith to Father; (d) Father completed his case plan and gained insight into the issues that occasioned jurisdiction; and (e) the court's decision to return Judith's younger brother Jesus to Father's custody when Jesus also suffered from mental health issues demonstrated that Judith should have been returned, too.

We conclude that: (a) the court was entitled to rely on Judith's statements because they were not inherently improbable; (b) Father forfeited his argument that services would have adequately protected Judith by failing to raise the argument below and, in any case, such services would not have sufficiently protected her; (c) Father forfeited his argument about DFCS's "objective assessment tool" both by failing to raise the argument below and by failing to cite to the record in his petition; (d) substantial evidence supported the court's finding that Father lacked sufficient insight into Judith's mental health issues; and (e) Jesus was sufficiently differently situated that the court's returning him to Father had little bearing on the proper outcome for Judith. We therefore deny Father's petition and lift the stay we previously imposed on the section 366.26 hearing.

## STATEMENT OF RELEVANT FACTS

### A.    *The Family and Prior DCFS Involvement*

Petitioner is the father of minors Judith R. and Jesus R. (born October 2008).  Mother F.C. did not participate in these proceedings, but a previous petition had been filed against her, alleging she had a history of substance abuse, was currently abusing methamphetamines, and suffered from mental and emotional problems.  DCFS reported that Mother had been out of the family's lives since February 2013, that her whereabouts were unknown, and that Father and the children were living with Father's girlfriend and her children.[2]

Between 2017 and 2018, DCFS received five referrals regarding the children, alleging physical abuse and general neglect.  In investigating one such referral, DCFS noted that Judith had been hospitalized for hearing voices and being a danger to herself.  All but one referral were closed as inconclusive; for the substantiated referral -- alleging general neglect by Father -- Father agreed to voluntary family maintenance.

### B.    *DCFS Investigates the Current Referral*

On November 20, 2018, DCFS received a referral from the child abuse hotline alleging that domestic violence had been occurring at the family home in the presence of the

---

[2]     Because the parties refer to Father's girlfriend as "Stepmother," we do so as well.

4

children.  Stepmother alleged that most recently, while intoxicated, Father hit and choked her, and stopped only because the children physically intervened.  Other violent incidents had occurred as well, with Father as the aggressor. Stepmother stated Father drank excessively and periodically used crystal methamphetamine.  She further claimed his substance use caused him to verbally and emotionally abuse the children.  Stepmother also reported that Father had struck Judith in her ribs with his fist hard enough to leave a bruise.  Father had vacated the house without the children, but had stated he intended to take them to stay with his brother, whom Judith had previously accused of sexually abusing her.[3]  DCFS investigated the same day.

A children's social worker (CSW) spoke with Stepmother, who confirmed the information in the referral. Stepmother additionally reported that she and Father had learned the previous year that Father was not Judith's biological parent, and while they initially withheld this information from Judith, recently Father had been telling Judith she was not his daughter and had threatened to leave Stepmother's house with Jesus but not Judith.

Judith, who was wearing a hoodie, removed her hood to show the CSW that she had cut her hair, which she had done because "'the voices in her head told her it was her fault,'" referencing a lie Father had forced her to tell about

---

[3]    It was also reported that Father had angrily instructed Judith to say she had fabricated the claim of sexual abuse by her uncle, so that the uncle would not get into trouble.

Stepmother hitting her and Jesus. Judith stated that she wanted to stay with Stepmother and did not want to live with Father, who would constantly undermine Stepmother, blaming her for Judith's troubles. She confirmed the incident in which Father punched her in the ribs. She also confirmed the incident in which Father assaulted Stepmother. Judith had been diagnosed with PTSD, cerebral palsy, and a congenital brain migration, and both children had "documented behavioral and developmental problems that stem from trauma while in the care of mother F[.] C[.]" Judith had been prescribed and was taking Zoloft and Seroquel. Jesus was taking Guanfacine.

The CSW also spoke with Father, who denied the allegations and claimed Stepmother had coached the children. Father contended many of the children's behavioral problems arose from their exposure to Stepmother. He did not believe the children needed medication.

On November 29, 2018, the court issued an order removing the children from Father, and DCFS placed them with Stepmother.

### C. *DCFS Files a Petition and Investigates Further*

On December 4, 2018, DCFS filed a petition alleging six counts under section 300, subdivisions (a), (b)(1), and (j). Counts a-1, b-2, and j-1 identically alleged that in October 2018, Father physically abused Judith by striking her with

6

his fist.  Counts a-2 and b-3 identically alleged that in November 2018, Father pushed Stepmother onto a couch and choked her while in the children's presence, requiring the children to intervene on her behalf.  Count b-1 alleged that Father had a history of substance abuse and was a current abuser of alcohol, cared for the children while under the influence of alcohol, and possessed methamphetamine in the children's home.  The court found a prima facie case and detained the children.

In a further interview with Judith, she told a dependency investigator that when she lived with Father, he would threaten to hit her with a belt, tell her she was not his daughter, and curse at her.  Judith also confirmed her previous statements that Father had punched her in the ribs, that her uncle had molested her and Father had asked her to lie about it, and that Father had assaulted Stepmother.  Stepmother confirmed the statements she made to the CSW.

Father again denied all allegations and suggested that Stepmother was coaching the children.  He claimed the children behaved differently during their visits with him, attributing the difference to Stepmother's "'trying to turn my kids against me.'"

After concerns were raised by the children's wraparound team regarding whether Stepmother had been coaching the children, they were placed in foster homes on April 15, 2019.  On April 23, 2019, Judith was admitted to a hospital for a psychological evaluation due to expressing

feelings of wanting to self-harm.  The next day, the court ordered that the children have no contact with Stepmother.

### D.  *Adjudication and Disposition*

At the April 29, 2019 adjudication and disposition hearing, Father agreed to plead no contest to an amended count b-1, stipulating there was a factual basis for that count.  As amended, the count alleged that Father "was unable to obtain appropriate mental health services for the children.  The children have special needs that require consistent services.  The child Judith does not wish to return to her father's care at this time.  Said conduct by the father, if left unresolved, places the children at risk of harm."  The court dismissed all other counts.  The children were removed from Father and he was provided with reunification services.  Father was ordered to complete ten random drug tests, take a parenting class, undergo individual counseling to address case issues, and participate in conjoint counseling with the children.

### E.  *Between Disposition and the Six-Month Review*

In an October 2019 status report for the six-month review hearing, it was noted that Judith had anger issues, which escalated to the point of her "blacking out and not remembering."  She became "verbally aggressive and assaultive towards" her foster mother, who stated these episodes occurred after returning from visits with Father.  In September 2019, Judith had reported seeing a "'Little

Monster'" who would tell her to hurt herself or others. Though Father and Jesus reported no issues with Father's visits with the children, DCFS expressed concern that Father thought Judith did not actually suffer from mental health problems but was instead manipulating the system.

In a December 2019 supplemental report, Judith's foster mother reported Judith still had "escalated behaviors of being verbally aggressive by yelling, cursing, and attempting to hurt herself." Judith continued receiving wraparound services and taking her medication. In mid-December, Judith attempted to cut herself at school with a soda can tab, because she was upset about the death of a dog in the foster home. Judith did not deny screaming at her brother and foster mother; she had no explanation for her behavior, only that she was sometimes irritated. The report also noted that while Father was in compliance with his case plan, DCFS was concerned he did not "fully grasp mental health as opposed to behavioral issues." At the six-month review hearing, the court found Father had made substantial progress in alleviating or mitigating the causes necessitating placement, but that continued jurisdiction was needed.

**F.** ***Between the Six-Month and Twelve-Month Reviews***

A February 2020 last minute information noted that Judith continued to have weekend visits with Father. DCFS confirmed that if Judith were returned to Father's custody,

she would still receive services from the agency currently providing her with wraparound services but would be assigned a new team based on the location of Father's home.

In a second February 2020 last minute information, DCFS reported concerns that Judith was visiting with Mother. Judith told both DCFS and her wraparound team that she had seen Mother twice and, along with Father and Jesus, had slept over at the home Mother shared with Judith's adult sister. While Father denied any contact with Mother and acknowledged that Judith had special needs and needed to continue receiving wraparound services, DCFS expressed concern both with Father's potentially allowing Mother to have contact with the children, and with his ability to provide Judith with appropriate services based on his request to have wraparound services meet with the family in a public place instead of at his home.

In a June 2020 status report for the twelve-month review, DCFS reported Judith was still receiving wraparound services, and was meeting weekly with an individual therapist. Judith had two episodes of being upset enough to "'see red,'" and she refused wraparound services for approximately four weeks. She loved Father and wanted to return to him but was conflicted because she loved her current foster mother. The foster mother stated that if Judith did not reunify with Father, she would like to adopt her. In an August 2020 Child and Family Team meeting, Judith expressed unhappiness at the plan to return her to Father's custody, opining that Father was not ready, that

she was concerned about schools, and that Father did not communicate with or pay attention to her.

Two weeks later, Judith's therapist reported that he had been unable to speak with Judith, and that her foster mother stated she was having suicidal ideations, verbalizing suicidal comments, and drawing suicidal figures. After the CSW visited the foster mother's home and instructed her to safeguard the items Judith could use to commit suicide, the CSW asked Judith whether she had a plan regarding suicide. Judith stated she did not, but laughed and said, "'There are other ways to do this.'" She refused to elaborate.

In September 2020, Judith's therapist reported a "'[m]eltdown'" and advised the foster mother to take Judith to a certain hospital's psychiatry department for an evaluation; the foster mother instead brought Judith to another hospital, where they instructed her to "keep watch" over Judith.

In a November 2020 last minute information, DCFS reported that on September 30, 2020, Judith stated she did not want to return to Father and wanted to stay with her foster mother. She acknowledged that her behavior was "escalating," and she was becoming "verbally and physically aggressive." Judith also claimed she had seen Mother again, when Father took her to get her hair done. Judith reported Father had threatened that if she did not return to his home, she could "forget about him and her brother." DCFS noted it continued to recommend conjoint counseling for Judith and Father, but Judith refused.

11

The last minute information additionally described an incident on October 23, 2020, when Judith refused to visit with Father because she had posted an LGBTQ flag on social media and when questioned, told Father she was gay. Judith reported Father began yelling at her to take the post down, claiming she was confused and that he wanted her to get married and have kids. Father denied yelling at Judith but admitted to requesting she remove the social media post. He stated that if Judith were gay, that would be "up to her," but if she were confused, she could get help. Father opined that Judith was going through a teenage phase and might be a little crazy, but eventually admitted that he knew "no one can change his daughter and that he knew a long time ago that his daughter liked girls." Father acknowledged he needed to support and love Judith "no matter what," and that he would continue doing so. He stated that while Judith did not like it when he set boundaries, she was happy when she visited, and her behavior changed when she returned to her foster mother. On October 26, 2020, Judith's therapist advised that Judith was not ready for conjoint therapy with Father, and that the therapist would have sessions with Father to "psycho educate him" regarding Judith's behaviors. On November 6, 2020, Judith reported she did not want to visit Father for fear that he would "judge her for being the way she is." Judith continued to refuse conjoint counseling.

On November 17, 2020, Judith reported she did not want to return to Father, for fear that he would yell at and

hit her. She reported that he did not understand she was gay, that he yelled at her and blamed her for having to take classes, and that he would complain about money. Judith described an incident in which Father threw her cell phone on the floor hard enough to break it after she shaved an eyebrow during a visit. Father also instructed her not to play with her gay foster brother for fear of being influenced and told her to lie to DCFS about seeing Mother. On November 19, 2020, the court specifically ordered that Mother was not to have any access to Judith, and Father was not to permit Mother to have such access.

On November 24, it was reported that Judith had been having suicidal ideations for several days; Judith reported seeing the "monster" again, and it was telling her to hurt herself. She was waking up during the night with nightmares, and became more irritable, though her therapist did not believe she had a plan or intent for suicide, and thus was in no imminent danger. Judith stated that if she were to be returned to Father, she would hang herself.

On December 1, 2020, DCFS was informed that Judith and her foster family had been exposed to COVID-19 at church the previous day. Judith reported no COVID-19 symptoms but admitted to feeling suicidal; she stated "'court'" was causing her stress. On December 23, 2020, the foster mother reported being upset because Father had a birthday celebration for Judith with many attendees, and no one wore masks.

On January 20, 2021, DCFS and wraparound services had a meeting with Judith, and both she and her foster mother reported she had not had any suicidal thoughts in the last month. However, Judith maintained she did not want to return to Father because she was afraid of him. The foster mother reported Judith had seen Mother at least ten times, that when Judith visited Father, they would go to gatherings without masks, that Father would leave the children in the car for hours, and that Father drank and drove with the children. Judith confirmed these statements.

In a meeting with Father on January 28, 2021, Father again reported that Judith did not behave around him the way she appeared to be behaving with her foster mother and opined that the foster mother was manipulating Judith into wanting to stay with her. The wraparound team continued to report that Judith maintained she would kill herself if forced to return to Father.

### G.   *The 12-Month Review Hearing*

At the 12-month review hearing on February 8, 2021, the court terminated jurisdiction as to Jesus, finding that the conditions that had prompted jurisdiction no longer existed and were unlikely to recur if jurisdiction was terminated.

As for Judith, Father's counsel asked the court to continue the hearing to permit conjoint counseling to occur, or for a custody evaluation to be performed, but the court denied the request, stating it had "more than enough

14

information" to assist in its decision. Judith's counsel requested the court terminate reunification services and set the matter for a permanency planning hearing. Counsel noted that Judith was still "adamant" in not wanting to return to Father, either that day or in the future; instead, she wanted her foster mother to become her legal guardian. Judith's counsel recounted Judith's history of negative behavior and mental health issues, and contended that while Father had made progress, he still did not know how to communicate with Judith, and did not take her mental health issues seriously. Father's counsel argued that Father had done everything asked of him and had a safe and stable home for Judith. He contended that Judith's threats of suicide were not evidence of an actual risk of harm, but rather an attempt to hold the court hostage. Arguing that Judith had visited Father multiple times without issue, Father's counsel contended there was no risk of harm, and Judith should be returned to Father. DCFS's counsel did not argue, but the court acknowledged its recommendation was to terminate jurisdiction and return Judith to Father.

The court indicated it had reviewed all the evidence and while Father had complied with the case plan, he had not gained an understanding of Judith's individual needs. While the court recognized that Judith could be "manipulating the system," the court believed she was "emotionally and mentally fragile." Though visits with Father had gone well, this meant only that Judith could visit with Father; it was not evidence she could live with him full-

time. The court pointed out that, despite everything Father had learned, he still reacted inappropriately to Judith's social media post regarding her sexual orientation and, while he later came to understand how he should have reacted, "the damage to Judith had already been done." Additionally, the court suspected Father was letting Mother have contact with Judith, which would be in violation of court orders and would demonstrate a lack of insight. The court also discussed the birthday party Father threw for Judith where many people were present without masks. The court opined these were all "small things that continue to convince the court that there is a general lack of insight" and that "Father is not taking Judith's conditions and her actions seriously." Thus, the court found that returning Judith to Father's care would "cause Judith emotional and thereby physical distress and detriment . . . because the court has reason to believe that she will hurt herself." The court terminated Father's reunification services and ordered a permanency planning hearing under section 366.26. Father timely challenged this order by writ petition, and we issued an order to show cause and stayed the hearing.

## DISCUSSION

We review for substantial evidence an order setting a permanency planning hearing under section 366.26. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.) "Under this standard of review[,] we examine the whole record in a light most favorable to the findings and

16

conclusions of the juvenile court and defer to the lower court on issues of credibility of the evidence and witnesses. [Citation.] We must resolve all conflicts in support of the determination and indulge all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact." (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216-217.)

At the 12-month review hearing, the court "shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) Here, the court found that returning Judith to Father's care would "cause Judith emotional and thereby physical distress and detriment . . . because the court has reason to believe that she will hurt herself."

Father argues the court erred in making this finding because: (a) based on her history of contradictory statements and "manufactured threats and episodes," Judith's statements were not credible or of solid value; (b) Judith's continued participation in services if returned to Father would have adequately protected her; (c) DCFS's "objective assessment tool" found no safety concerns; (d) Father completed his case plan and gained insight; and (e) the court's decision to return Jesus to Father's custody when he had mental health issues demonstrated that Judith too

17

should have been returned to Father. We find none of these arguments persuasive.

## A. *The Court Was Entitled to Believe Judith's Statements*

Father argues that because Judith had a history of deception, because she had previously threatened to kill herself, and because her statements to DCFS were contradicted, the court was not entitled to rely on her statements to reach its conclusion that she would be in danger if returned to Father. We do not second-guess a trial court's determination of credibility. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.) "We cannot reject the testimony of a witness that the trier of fact chooses to believe unless the testimony is physically impossible or its falsity is apparent without resorting to inferences or deductions. As part of its task, the trier of fact may believe and accept as true only part of a witness's testimony and disregard the rest. On appeal, we must accept that part of the testimony which supports the judgment." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830; see also *People v. White* (2014) 230 Cal.App.4th 305, 319, fn. 14 ["under the principles governing review for the existence of substantial evidence, the testimony of a witness is ordinarily sufficient to uphold a judgment 'even if it is contradicted by other evidence, inconsistent or false as to other portions'"]; *ibid.* ["'"Testimony may be rejected only when it is inherently improbable or incredible, i.e., '"unbelievable per se,"'

18

physically impossible or "'wholly unacceptable to reasonable minds'""""'].)

Whatever Judith's other statements, she expressly stated she would kill herself if returned to Father's custody. While not required to credit the statement, the court was entitled to consider it in the context of other evidence. Judith had repeatedly expressed suicidal ideation, previously attempted to cut herself, been hospitalized for psychiatric reasons, and been diagnosed with both physical and mental disorders. Because there is nothing inherently improbable or incredible in her statement, and it is neither physically impossible nor wholly unacceptable to reasonable minds, we accept it as substantial evidence.[4] It is irrelevant whether other evidence might have supported a conclusion that Judith was not serious about killing herself, because when """"two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and a 'reviewing court is without power to substitute its deductions for those of the trial court.'"""" (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

---

[4] Father points out the court lacked evidence from mental health professionals. None was needed. (See *Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 202 [if decision whether child is at substantial risk of harm can be made within ordinary experience, expert testimony is unnecessary].) Given the court's determination that Judith's threat to kill herself was sincere, ordinary experience sufficiently informed the court's decision that such an outcome would place Judith at substantial risk of harm.

**B.** *Father Has Forfeited the Argument That the Court Erred in Failing to Consider That Judith Would Have Access to Services in His Custody*

Father argues the court erred by not considering the safeguards that would be in place if Judith were returned to his care. Specifically, he argues that "[w]hile in the care of the foster parent, Judith continued to have breakdowns and suicidal ideations, which were dealt with by the Department and Judith's therapy team. . . . The same resources and referrals could have been provided to Father to assist with the breakdowns in Judith's health."

Father has forfeited this argument by failing to raise it below. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221 ["A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court"]; *id.* at 222 ["Forfeiture . . . applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceeding"].)

Moreover, given the court's determination that Judith was serious in her stated intention to kill herself if returned to Father's custody, there would be no error in concluding that continued services would be insufficient to protect Judith. First, Judith was already receiving those services while in the care of her foster mother, and they did not prevent her from declaring she would kill herself if returned to Father -- there is no reason to think they would be any

20

more successful if her perceived doomsday scenario were to materialize. Second, Father does not explain how the services currently provided to Judith could prevent her from committing suicide. No service could watch Judith every minute of every day, and if the court ignored her express declaration of her intention if returned to Father, there is no reason to believe she would reiterate it before acting to her detriment.[5]

### C. *Father Has Forfeited Any Argument Regarding the DCFS "Objective Assessment Tool"*

Father argues the court erred in not considering the findings by DCFS's "objective assessment tool" that Judith could safely be returned to Father. Like his argument regarding sufficient safeguards, Father has forfeited this argument by failing to raise it below. (*In re Dakota H.*, *supra*, 132 Cal.App.4th at 221, 222.) He has also forfeited it on appeal by failing to cite to the record regarding this "objective assessment tool." (Cal. Rules of Court, rule 8.452(b)(3) [memorandum accompanying writ petition to review order setting hearing under section 366.26 "must support any reference to a matter in the record by a citation

---

[5] Citing *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, Father argues that the court should have returned Judith to his care because "an absolute guarantee of safety" is not required. But not requiring an absolute guaranty of safety does not equate to dispensing with any guaranty of safety.

to the record"]; see also *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 ["we may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record"].) In any case, Father cites no authority holding that the results from this assessment tool are dispositive and override all other considerations.

### D. *The Court Justifiably Found Father's Insight Insufficient*

The court found that incidents such as Father's throwing a birthday party for Judith in which the many attendees failed to wear masks despite the ongoing pandemic, and his reaction to Judith's declaration that she was gay, "continue to convince the court that there is a general lack of insight" and that "Father is not taking Judith's conditions and her actions seriously." Father agrees that a parent's lack of insight is evidence a court may properly consider when deciding whether a child may be returned safely to the parent, but argues he is being held to an "impossibly high standard." In particular, Father contends his reaction to Judith's coming out was reasonable, and that it was unfair to fault him for holding a birthday party that potentially exposed Judith to COVID-19 when Judith had already been exposed to COVID-19 from attending church with her foster mother. Additionally, Father argues that he had improved significantly from when the case was originally brought. We are unpersuaded.

We discern no error in the court finding that Father's reaction to Judith's coming out demonstrated a lack of insight. Judith was emotionally and mentally fragile. Coming out is a distinctly vulnerable moment in any person's life, and particularly in the life of a teenager suffering from severe mental health problems, including suicidal ideation. Father's reaction to Judith's publicly declaring her homosexuality was to yell at her and suggest she was confused, even though he later admitted he always knew she "liked girls." Father argues he is entitled to his beliefs on homosexuality and cannot be faulted for failing to "immediately accept" Judith's coming out. He misses the point. The court did not hold his beliefs on homosexuality against him; rather, it determined that his yelling at his daughter about her sexual orientation at a particularly vulnerable time was evidence that he lacked insight into her mental health issues, and what could trigger them.

Regarding Father's complaint that it was unfair the court chided him for holding an unmasked birthday party for Judith with many unmasked attendees when Judith had already been exposed to COVID-19 at the foster mother's church, Father presents no evidence regarding the circumstances of the church gathering, where exposure might have occurred despite the presence of safeguards. By contrast, it is undisputed that Father failed to insist that attendees at the party he hosted wear masks. In any event, given Father's responsibility to safeguard his daughter's

23

well-being, it is irrelevant that her health might previously have been jeopardized.

Finally, while it is commendable that Father made progress from the time of Judith's detention, the question before the court was whether he had gained sufficient insight into Judith's mental health issues and how to address them. (See, e.g., *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143 ["simply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan"].) Taken as a whole, the record supports the court's conclusion that he had not.

### E. *Jesus Was Differently Situated*

Father argues that because both Judith and Jesus "had been found to have special needs the Father did not take care of," and the court returned Jesus to Father's care, the court "erred in finding Judith was so differently situated that Father posed a risk to her, but not to Jesus." We disagree.

Substantial evidence supported the court's determination that Judith was so differently situated that Father posed a risk to her, but not Jesus. Judith had multiple incidents of suicidal ideation. She had a "little monster" who told her to hurt herself. She had been yelled at by Father over her sexual orientation. Jesus had none of

24

these issues.  Put simply, the court found Judith to be emotionally and mentally fragile but made no similar finding regarding Jesus.  Thus, the court's determination that Jesus could safely be returned to Father's custody mandated no similar conclusion for Judith.

## DISPOSITION

We deny Father's petition, and lift the stay previously imposed on the section 366.26 hearing.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



MANELLA, P. J.



We concur:



WILLHITE, J.



CURREY, J.

26