Filed 5/18/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B312583 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA457318) |
| v. | |
| KAYLA JUANITA MIDDLETON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Lisa B. Lench, Judge. Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Heidi Salerno, Deputy Attorney General, for Plaintiff and Respondent.

———————————

# INTRODUCTION

A jury convicted Kayla Juanita Middleton of human trafficking of a minor for a commercial sex act (Pen. Code, § 236.1, subd. (c)),[1] misdemeanor false imprisonment (§ 237, subd. (a)), and forcible rape in concert of a minor 14 years or older as an aider and abettor (§ 264.1, subd. (a)). On appeal, Middleton contends the evidence is insufficient to support her convictions and the judgment should be reversed on the basis of instructional error. We affirm.

Section 236.1, subdivision (c), prohibits the human trafficking of a minor and attempted human trafficking of a minor. Middleton was convicted under the attempt prong. Relying on *People v. Moses* (2020) 10 Cal.5th 893 (*Moses I*), she contends the trial court erred by not instructing the jury that the People had to prove specific intent as to age, and by instructing the jury that mistake of fact as to age is not a defense to the attempt charge.

We hold there was no instructional error: A defendant violates section 236.1, subdivision (c), when the defendant attempts, but fails, to traffic an actual minor, even if the defendant lacks specific intent regarding the victim's age. Mistake of fact as to age is not a defense to attempted human trafficking under section 236.1, subdivision (c), when the victim is a minor. (§ 236.1, subd. (f).) Also, substantial evidence supports her conviction for trafficking.

---

[1] Statutory references are to the Penal Code unless otherwise noted.

We also hold there was no instructional error on the rape-in-concert charge. Under section 264.1, subdivision (a), a defendant commits the crime of rape in concert "when the defendant, voluntarily acting in concert with another person, *by force or violence* and against the will of the victim, committed an act described in Section 261 . . . , either personally or by aiding and abetting the other person." (Italics added.) The jury was instructed that to convict Middleton of rape in concert it had to find she "voluntarily aided and abetted someone else who personally committed forcible rape." The jury would understand "forcible rape" to mean "rape by force," and thus the instruction was not erroneous. Substantial evidence supported the rape-in-concert conviction.

## FACTUAL AND PROCEDURAL HISTORY

A.      *The Information*

In February 2018, the People filed a 19-count information against Middleton and codefendants Malcolm Boles and Christopher Sangalang, alleging the following charges against Middleton: human trafficking of a minor through use of force, fear, and coercion, in violation of section 236.1, subdivision (c)(2) (Count 9); forcible rape in concert in violation of section 264.1, subdivision (b)(2) (Count 10); and kidnapping in violation of section 207, subdivision (a) (Count 17). The People additionally alleged the rape was committed upon a minor 14 years old or older (§ 264, subd. (c)(2)); the rape was committed by way of kidnapping; and Middleton administered a controlled substance against the victim's will within the meaning of section 667.61, subdivisions (a), (d), and (e).

3

B.    *Prosecution Evidence*

1.    *Chelsea Disappears with Sangalang and Middleton*

The alleged victim was Chelsea B., a 16-year-old girl.  At approximately 3:45 p.m. on February 2, 2017, Chelsea's mother dropped Chelsea off at a friend's house to get her hair braided.  The mother planned to pick Chelsea up about four to five hours later.  Chelsea's mother described Chelsea as a "childlike" girl who required adult supervision and assistance with basic self-care.  She found it difficult to read social cues and to recognize unsafe situations.

Chelsea spent the appointment texting with Sangalang, whom she had met on Facebook and considered a potential boyfriend.  Sangalang told Chelsea he would pick her up to go to the mall and asked her for money to buy food.  Sangalang had previously instructed Chelsea to pack extra clothes before the appointment because they would be going to a hotel together.  Sangalang had also told her she could make a lot of money doing sex work and live a "rich, nice life" with lots of cars and a fancy house.  Chelsea believed Sangalang was talking about just the two of them.

Before the hair appointment, she had met Sangalang in person twice.  He had come to her bedroom window and had asked for money, and she had given him money and her ATM card.  Chelsea had told Sangalang she was 16.  Chelsea had also communicated with Boles on Facebook and told him she was 16.

Near the end of the appointment, Sangalang showed up outside Brea Persley's house, where Chelsea was having her hair braided.  Sangalang was accompanied by Middleton, whom Chelsea had never met.  Persley testified that she told Chelsea it was wrong to invite people over and that she was going to call

4

Chelsea's mother.  Sangalang demanded Chelsea give him money and stated angrily "Come on.  Let's go."  When Chelsea asked Sangalang who Middleton was, he told her Middleton was his "homegirl."  Later Sangalang told Chelsea Middleton worked for him as his "ho" and "prostitute," but in a police interview Middleton stated she did not have a pimp and worked alone for herself as a prostitute.

Chelsea told Persley she would be back later that night or the next day.  Persley testified she went inside to get her phone, and while Persley was inside, Chelsea left with Sangalang and Middleton.  Persley called Chelsea's mother and reported what happened, and they both called the police to report Chelsea missing.  Chelsea's mother and Persley texted and called Chelsea repeatedly, but she did not respond.  Chelsea's mother testified she circled the neighborhood in her car then drove to the Compton sheriff's station when she could not find Chelsea.  The police and Chelsea's mother went to Persley's house, and they all searched for Chelsea until 3:00 a.m.

2. *Chelsea Is Raped by Boles at Middleton's Apartment Complex and Instructed in Street Prostitution by the Three Codefendants and Another Individual*

Chelsea testified that after she left Persley's house, she followed Sangalang and Middleton to a van driven by Sangalang's grandmother.  Two little girls and Boles were also in the van.  Sangalang yelled at her to get in and told her to sit in back next to Boles.  Boles began touching Chelsea persistently, wrapping his arm around her waist, pulling her close, squeezing her face, and grabbing her thigh and knee.  She repeatedly moved Boles's hands off her and told him "no, don't touch me," and to

stop and get away.  Boles told her to stop playing "hard to get" and said he had to "fix her attitude."  Sangalang moved into the back row on her other side and grabbed her other thigh.  Chelsea told Sangalang to stop.  Chelsea heard Boles tell Sangalang that Chelsea was going to make them a lot of money.

They arrived at a shopping center, and Sangalang told Middleton to watch Chelsea in the van.  Sangalang and Boles got out of the van, along with the grandmother and little girls.  After they left, Chelsea introduced herself to Middleton.  She asked why Sangalang told Middleton to watch her; Middleton looked away and changed the subject.  Chelsea told Middleton she was 16 years old.  When the others returned, Boles continued to rub her thigh and ignored Chelsea's requests to stop.

Sangalang's grandmother dropped Sangalang, Chelsea, Middleton, and Boles near a gas station.  Chelsea asked Middleton where they were going, but Middleton did not reply.  Chelsea then asked Sangalang where they were going; he told her, "Don't worry about it."  The group walked to a smoke shop then to the house of one of Sangalang's friends, where they all smoked marijuana with some other people in a parked van.

Chelsea said she wanted to return to Persley's house.  Sangalang replied they were going to Middleton's house first.  Before they left for Middleton's house, a young woman named Perfection arrived who Sangalang said was going to fix Chelsea's attitude.  Sangalang instructed Chelsea to walk with Perfection and meet them at Middleton's house later.  Sangalang, Boles, and Middleton took Chelsea's backpack, purse, and cell phone with them as they left, and told her she would get the items back later.

Middleton had spoken earlier with Chelsea about commercial sex work, instructing her what to charge and not to

accept less than she was told. Middleton warned Chelsea if she did not make money Sangalang would get mad. Perfection also told Chelsea that Sangalang expected her to make money for him by having sex with men. Chelsea said she did not want to have sex for money, and Perfection said Sangalang would be angry and would hurt Chelsea if she refused. Perfection described what to charge for different sex acts and took Chelsea to walk an area called "the blade" in search of clients. One man offered them each $100 for sex, but Chelsea told Perfection she did not want to have sex. Perfection then called Sangalang, and he told Chelsea he would beat her unless she made money for him. Around 11:00 p.m. a friend of Perfection's picked them up and dropped Chelsea off at Middleton's apartment complex.

Middleton met Chelsea at the entrance and took her to the complex's laundry room where Boles and Sangalang were waiting. Chelsea's phone was dead. She asked for a charger, but no one gave her one. She asked Middleton, Sangalang and Boles if she could use their phones to contact her mother, but they refused.

Middleton and Chelsea left to go across the street to a gas station to get snacks. Before Middleton and Chelsea left, Sangalang told Middleton to watch Chelsea so "no pimp [would] get [her]," and told Chelsea she could not tell men that she was 16 because it was illegal for men to have sex with people under 18. Men in the store flirted with Chelsea and Middleton, asking their names and ages, and Middleton and Chelsea stated they were 20 years old. Another man asked Chelsea for her name, age, and number. She did not respond, but Middleton told him to give Middleton his number and she would have Chelsea call him.

Middleton and Chelsea returned and rejoined Sangalang and Boles in the laundry room. They all smoked more marijuana, and Sangalang gave Chelsea a pill that made her feel dizzy and unable to walk. Middleton told Chelsea she had to lose her virginity with Boles or Sangalang. Chelsea told Middleton she was willing to have sex with Sangalang but not Boles. She also told Middleton she did not want to lose her virginity that night, but Middleton told her older guys did not want to have sex with a virgin. Chelsea told Middleton and Sangalang she did not want to have sex with Boles, but Sangalang told her she had to. Middleton told the police interviewer she knew Chelsea did not want to have sex with Boles.

Middleton and Sangalang left the laundry room and closed the door, leaving Chelsea alone with Boles. Chelsea told him, "Don't touch me" and pushed him away. Boles rubbed her thighs, ripped her shorts, pushed her to the ground, and got on top of her. Chelsea screamed Middleton's and Sangalang's names loudly for help, but they remained outside. Boles got mad and roughly pulled down her shorts, scratching the side of her thighs and rubbing his penis on her leg. She pushed him off and ran out of the room, slamming the door shut. When Chelsea ran out, she was scared, angry and crying. She told Middleton and Sangalang that she could not have sex and wanted to go home.

Sangalang told Chelsea he would calm Boles down and tell him to go slow. Sangalang went into the laundry room. Middleton told Chelsea everything would be all right and Sangalang would talk with Boles. Sangalang came back and told Chelsea that Boles agreed to be gentle because it was her first time. Chelsea repeated she did not want to have sex with Boles.

Middleton and Sangalang walked Chelsea back into the laundry room and stayed in the room while Boles continued assaulting Chelsea over the following one to two hours. Boles yelled at Chelsea, took off her shirt and bra, and called her a "bitch" when she continued resisting. Sangalang came over and told Chelsea to relax. Boles took off his clothes and lay on top of Chelsea, pinning down her wrists. Boles shoved his fingers into her vagina. Chelsea repeatedly said he was hurting her and told him to stop, but he did not. When she looked toward Middleton and Sangalang for help, they were having sex with each other. Boles asked Sangalang for a condom, which Sangalang brought him. Boles put his penis in Chelsea's vagina; she was crying in pain and told him repeatedly to stop and that it hurt. She tried to push him off but could not because his body was on top of hers. He got off her and took off the condom and said he was "[going] in raw." She told him not to, but Boles laughed, lay on top of her, pinned her arms about her head, and put his penis in her again, telling her to relax and calling her a crybaby when she cried. Chelsea screamed Sangalang's name and continued to try to push Boles off, telling him he was hurting her and to stop.

Boles demanded oral sex and tried to shove his penis in her mouth. Sangalang told Chelsea to relax her lips and open her mouth when she resisted. Boles put his penis in her mouth and told her to relax. Boles told her she had to call him and Sangalang "Daddy." Chelsea refused, and Boles then choked her and threatened to put a gun to her head and shoot her. In her police interview, Middleton stated that Chelsea made a lot of noise and had repeatedly told Boles to stop, and that Middleton told Boles to leave Chelsea alone but he ignored her.

Chelsea screamed at the top of her lungs during the attack. Middleton told her to stay quiet because people in her apartment building would hear her and call the police. Sangalang and Boles also told Chelsea to stop screaming and shoved a towel in Chelsea's mouth. Boles went back and forth between vaginally and orally copulating her for one or two hours. Boles finally ejaculated on Chelsea's forehead then told her to wipe her face and get dressed. Boles told Middleton to stay with Chelsea, and Boles and Sangalang left the laundry room.

Middleton took Chelsea to her apartment and let her use the bathroom with the door open, saying she could not leave her alone. Chelsea was in too much pain to wipe herself and began crying when she saw she was bleeding. Middleton refused to let Chelsea shower, saying they had to hurry up to leave. Perfection then picked up Chelsea, Middleton, Sangalang and Boles and left them near a fast food restaurant, where Sangalang gave them all pills that made Chelsea feel high and numb.

They then walked to a burger stand where Middleton instructed Chelsea how to conduct commercial sex work on the street. Middleton ordered food for herself and the two men but not for Chelsea; Sangalang told Chelsea they would feed her after she was done working. Middleton told Chelsea she should be able to make lots of money because many cars had been honking at her which meant they wanted to have sex with her. Middleton told Chelsea what to charge for different sex acts and that she was to give the money she earned to Sangalang and he would give some back to her. Middleton instructed Chelsea on types of men to avoid and told Chelsea not to go home with men but have them order a room close to Sangalang, Middleton, and Boles so they could pick her up. Middleton gave her condoms and told her

to make sure she used them.  Middleton told her if she did not have sex with men for money, Sangalang would hurt her.

Middleton directed Chelsea to work certain locations along Figueroa Street and Gage Avenue and to call Boles or Sangalang if there was any trouble.  Middleton told her to avoid police and not talk to men who did not want to pay for sex.  Boles told her to walk slowly and pay attention to the cars.  In her police interview, Middleton stated she told Chelsea to have sex with men for money and what to charge; however, Chelsea just walked and did not do anything she was instructed to do.  Sangalang left, and Middleton and Chelsea went to Gage Avenue and walked together for a while with Boles behind them, then took a bus to Figueroa Street.

3.     *Chelsea Is Found the Day After Her Disappearance*

Around 3:00 a.m. on February 3, 2017, Chelsea's mother published a missing person post on Facebook with a photo of Chelsea in the red plaid flannel shirt she was wearing when she went missing.  Around 10:00 a.m., Chelsea's mother received a phone call from a person who reported seeing Chelsea in the same shirt on 66th and Figueroa Streets.  Chelsea's father testified he drove to the area and a woman on the street told him she had seen a young lady in a red flannel shirt with two other people at a nearby convenience store.  As he drove southbound past the store, Chelsea's father saw Chelsea walking with Middleton and Boles, who were unfamiliar to him.  He stopped his car and heard Middleton and Boles both command Chelsea to "[k]eep your fucking head down."  Chelsea's father jumped out and yelled at Chelsea to get in the car while he chased Middleton and Boles, who fled.

11

Chelsea was crying. Her eyes were red, and her voice was shaking. She looked "like she was on something." She said, "I'm sorry Daddy. I don't know what happened." She said, "I was scared. I'm scared."

Chelsea was taken to the hospital for a sexual assault examination. Chelsea's underwear was torn, and she reported vaginal pain and pain in her back, hip, and neck. Chelsea had abrasions to her arms and legs and bruising to her legs. The opening of her vagina was torn, and her hymen was torn and bruised. The nurse practitioner was unable to use the speculum as Chelsea was in too much pain. Chelsea described being sexually assaulted by "Mac" on the laundry room floor, providing details consistent with those summarized above.

Swabs from Chelsea's vulva, anus, and rectum tested positive for blood. Swabs from her right and left cheeks, mouth, right breast, left breast, chest, neck, vulva, anus, vagina, and back tested positive for semen. DNA tests of the semen samples matched Boles and excluded Sangalang. Chelsea reported she consumed marijuana and two pills. Chelsea's urine sample showed the presence of marijuana, hydrocodone, hydromorphone, amphetamine, and methamphetamine.

C.    *Defense Evidence*

Middleton did not testify in her own defense. Forensic interview specialist Susy Flores, who interviewed Chelsea on February 8 and 10, 2017, testified that Chelsea told her Middleton and Sangalang could hear but not see her and Boles during the rape. Chelsea stated that during the rape she was screaming or yelling and that it hurt her. Chelsea further said she told Boles to "stop and stuff," and that she was scared of

Boles.  She stated Boles pinned her down with his hand on her chest, told her to call him "Daddy," and choked her when she refused, but did not tell Flores that Boles threatened to shoot her. Chelsea stated there was a towel in her mouth during the attack. Chelsea stated Sangalang also told her to do certain things.

Chelsea did not tell Flores that Middleton was in charge of watching her.  Chelsea said she did not call her mother because she did not want her to know she was hanging out with friends, and she did not say she was kept from using her cell phone. Chelsea told Flores about Perfection, but not that she had come to "fix" Chelsea's attitude.

Middleton's father testified that on February 2 or 3, 2017, between midnight and 4:00 a.m. Middleton brought a friend inside their apartment to use the bathroom.  After that, Middleton left for a couple of days; he did not know where she went.  At no time that night or any other night did he hear screaming or yelling around the laundry room or in the courtyard.

D.     *Jury Verdict, Motion for New Trial, and Sentencing*
Middleton was tried together with Boles and Sangalang, but before a separate jury.  The jury convicted Middleton of human trafficking of a minor for a commercial sex act through use of force and fear (§ 236.1, subd. (c)(2)), misdemeanor false imprisonment (§ 237, subd. (a)) as a lesser included offense to kidnapping, and forcible rape in concert of a minor 14 years or older on the basis that Middleton aided and abetted someone who personally committed the rape (§ 264.1, subd. (a)).  The jury found not true the section 667.61 allegations that the rape was committed by kidnapping and through administration of a

13

controlled substance against the victim's will.  On Middleton's motion for new trial, the superior court ruled there was no significant evidence of force or fear on the human trafficking count, and ordered Middleton sentenced under section 236.1, subdivision (c)(1), instead.

The court sentenced Middleton to the lower term of seven years on the rape-in-concert count.  The court ruled that it selected the lower term "for the reason that the defendant does not have a criminal record, had a minor role in the crime and was ultimately induced by others to commit the crime; the factors in mitigation outweigh the factors in aggravation."  The court imposed a consecutive term of two years eight months (one-third the middle term) on the human trafficking count and a concurrent term of one year for false imprisonment, for an aggregate prison term of nine years eight months.

This appeal followed.

## DISCUSSION

A.    *Conviction for Human Trafficking*
      1.    *The Superior Court Did Not Err in Its Human*
            *Trafficking Instructions*

The crime of human trafficking of a minor for a commercial sex act is defined in section 236.1, subdivision (c), which provides in part:  "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of Section . . . 266h [pimping], 266i [pandering] . . . is guilty of human trafficking."

Subdivision (f) of section 236.1 provides: "Mistake of fact as to the age of a victim of human trafficking who is a minor at the time of the commission of the offense is not a defense to a criminal prosecution under this section."

As noted, a person violates section 236.1, subdivision (c), when he or she, among other things, "*attempts* to . . . induce . . . *a person who is a minor* . . . to engage in a commercial sex act." (Italics added.) Middleton contends to prove she violated this section, the People had to prove Middleton had the specific intent to enlist a minor to engage in commercial sex (not just the intent to induce a person who happened to be a minor to engage in commercial sex). Middleton contends the trial court erred by not instructing the jury that the People had to prove specific intent as to age and by instructing that mistake of fact as to age is not a defense to the attempt charge. Middleton argues this conclusion is compelled by *Moses I, supra,* 10 Cal.5th 893 and the general law regarding attempted crimes.

"'[A] claim that a court failed to properly instruct on the applicable principles of law is reviewed de novo.'" (*People v. Dearborne* (2019) 34 Cal.App.5th 250, 260 (*Dearborne*).) "It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Molano* (2019) 7 Cal.5th 620, 667, quotation marks omitted.)

In *Moses I*, the Supreme Court considered whether a defendant could be convicted of human trafficking of a minor under section 236.1, subdivision (c), if the individual the defendant believed was a minor was actually an adult undercover police officer. (*Moses I, supra*, 10 Cal.5th at pp. 895-896.) The

15

parties agreed "that attempting to induce a police decoy posing as a minor to commit a commercial sex act is a punishable offense. They disagree[d] whether the crime falls under the provisions of section 236.1(c), or the traditional attempt statutes, sections 21a and 664." (*Id.* at p. 902.) The distinction was important because if the crime could be punished only under the attempt statutes, the maximum punishment would be only half of what it would be under section 236.1, subdivision (c)(1). (*Moses I*, at p. 902.)

Moses argued the plain language of section 236.1 requires that the victim actually be a minor and thus the defendant could not be convicted directly under that section. The court rejected that argument, concluding the word "attempt" as used in section 236.1 had to be interpreted in accordance with the "peculiar and appropriate meaning" it has acquired under the law. (*Moses I, supra,* 10 Cal.5th at p. 903). The "peculiar and appropriate" meaning of "attempt" is embodied in section 21a, which requires two elements: "a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a; see *Moses I,* at p. 908.) Thus, the court concluded a defendant could be convicted under the attempt prong of section 236.1, subdivision (c)(1), if the defendant had the specific intent to commit the crime, including specific intent regarding the age of the victim, even if the person at whom the attempt was directed was not a minor but an adult decoy.

The court summed up its holding regarding the operation of section 236.1, subdivision (c), as follows: "To be convicted of the completed crime of *inducing* a minor to engage in a commercial sex act, the person induced must be a minor. To commit the crime of *attempting to induce* a minor, the defendant must act with the "'specific intent to commit the [completed] crime'"

16

[citation], i.e., the intent to cause, induce, or persuade a minor to engage in a commercial sex act, *at least when no actual minor victim is involved.* The defendant must act with the additional intent to effect or maintain a violation of one of the offenses enumerated in the statute. If these elements are met, the fact that the particular target of his efforts is not actually a minor is not a defense." (*Moses I, supra,* 10 Cal.5th at pp. 912-913, italics added, fn. omitted.)

In reaching that conclusion, the court considered whether the result was inconsistent with section 236.1, subdivision (f), but concluded the subdivision did not apply when the target of the defendant's attempts was not a minor. Subdivision (f) "eliminates a mistake of age defense if the defendant successfully induces a minor, even if acting under a mistake of fact. It does not speak to the converse situation, when the defendant *attempts* to induce a person the defendant actually believes to be a minor but who is in fact an adult. Under the provisions of section 236.1, subdivision (c), and the law of attempt, such conduct is punishable as human trafficking so long as the defendant *intended to induce a minor* to engage in such conduct. There is no inconsistency between disallowing a mistake of age defense when the victim is an actual minor and requiring a specific *intent* to induce a minor when the defendant unwittingly targets a police decoy. Nothing in subdivision (f) speaks to the latter intent requirement." (*Moses I, supra,* 10 Cal.5th at p. 909.)

The court declined to reach the issue we face now, stating: "We are not called upon here to determine the interplay between section 236.1, subdivision (f) and the specific intent required for the attempt prong of subdivision (c) *when the defendant attempts, but fails, to induce an actual minor to engage in a commercial sex*

17

*act*.  We offer no view on whether a mistake of fact as to the victim's age would be a defense in that situation." (*Moses I, supra*, 10 Cal.5th at p. 909, fn.10, italics added.)

It is the interplay between subdivisions (c) and (f) of section 236.1 we must address here, and specifically whether the language in subdivision (f) means the specific intent requirement in section 21a does not apply when the defendant attempts but fails to induce an actual minor.

As discussed, under subdivision (c), a person is guilty of human trafficking if, among other things, he or she "causes, induces, or persuades, or *attempts* to cause, induce, or persuade, a person who is a minor . . . to engage in a commercial sex act, with the intent to effect or maintain a violation of Section . . . 266i." (Italics added.)  Middleton argues the *Moses I* court's statutory analysis applies equally when the object of the attempt is an actual minor, and therefore, specific intent regarding age is an element of all attempt charges under subsection (c).  We reject this argument.  Subdivision (f) makes clear specific intent regarding the victim's age is not an element of the attempt prong of subdivision (c) when the alleged victim is an actual minor.

Again, subdivision (f) provides:  "Mistake of fact as to the age of a victim of human trafficking who is a minor at the time of the commission of the offense is not *a defense* to a criminal prosecution under this section."  (§ 236.1, subd. (f), italics added.)  This subdivision does not distinguish between the two ways section 236.1, subdivision (c), can be violated, that is, when a person (1) actually "induces a minor to engage in a commercial sex act; or (2) attempts to induce a minor to engage in such an act." (*Moses I, supra,* 10 Cal.5th at p. 902 [setting forth the two ways the statute can be violated].)  From the plain language of

18

the statute, we therefore conclude subdivision (f) applies to both offenses. Mistake of fact regarding the age of the victim is not a *defense* to either the completed crime or the attempted crime.

The question is whether the unavailability of the mistake-of-fact *defense* necessarily means that specific intent regarding age is not an *element* of the attempt charge when the victim is a minor. Mistake of fact "is often described as a 'defense' to [a] charge. [Citation.] But the term is somewhat misleading, because mistake of fact is, generally speaking, 'not a true affirmative defense.' [Citation; fn. omitted.] It is, rather, an assertion by the defendant that a particular factual error in his perception of the world led him to lack the mens rea required for the crime. (See Pen. Code, § 26, par. [3] [persons are not capable of committing crimes if they 'committed the act . . . under an ignorance or mistake of fact, which disproves any criminal intent']; [*People v.*] *Lawson* [(2013) 215 Cal.App.4th 108,] 111 ['The mistake-of-fact defense operates to negate the requisite criminal intent or mens rea element of the crime']; *People v. Anderson* (2011) 51 Cal.4th 989, 996-998 [citation] [same conclusion with respect to similar 'defense' of accident]; see also, e.g., *State v. Sexton* (1999) 160 N.J. 93 [733 A.2d 1125, 1128-1130] [discussing the relationship between mistake of fact and mens rea].)." (*People v. Hendrix* (2022) 13 Cal.5th 933, 940 (*Hendrix*).)

*Hendrix* explained: "Say a defendant is charged for theft of a box of oranges. [Citation.] He claims he mistakenly thought the oranges were his. If the defendant indeed believed the oranges were his, it is necessarily true that he did not intend to steal them from someone else. His mistake of fact claim, then, is simply one particular way of saying he lacked the mens rea

19

required for theft. [Citation.] In this way mistake of fact operates as a kind of failure-of-proof defense, reflecting a defendant's attempt to suggest the prosecution failed in its burden to establish beyond a reasonable doubt that the defendant acted with the criminal intent required for the offense." (*Hendrix, supra,* 13 Cal.5th at p. 940.)

Accordingly, saying a defendant established a mistake-of-fact defense is the equivalent of saying the People failed to prove defendant acted with the requisite intent. As the *Hendrix* Court expressly recognized, those are two ways of saying the same thing: the defendant lacked the requisite state of mind. (*Hendrix, supra,* 13 Cal.5th at p. 941.)

Applying this logic, we conclude the phrase "[m]istake of fact as to the age of the victim . . . *who is a minor* . . . is not a defense" is just another way of saying that specific intent as to the age of the victim is not an element of the offense when the victim is a minor. Since there is nothing in the language of section 236.1, subdivision (f), distinguishing between actual and attempted inducement, subdivision (f) thus necessarily eliminates the specific intent element regarding age when a defendant attempts, but fails, to induce a person who is actually a minor to engage in commercial sex acts, even if the defendant believes the victim is an adult. (See *Moses I*, 10 Cal.5th at pp. 911-912 [at least to completed offenses, subdivision (f) "holds the defendant liable for targeting an actual minor victim even if the defendant believes the victim is an adult"].) "Precluding [the mistake-of-fact] defense renders the defendant's mental state regarding the victim's minority or majority immaterial." (*People v. Moses* (2021) 65 Cal.App.5th 14, 22 (*Moses II*) [on remand from Supreme Court].)

20

This conclusion is consistent with *Moses I.* As previously discussed, the court concluded subdivision (f) had no relevance to a situation where the person who the defendant believed was a minor was actually an adult. (*Moses I, supra*, 10 Cal.5th at p. 909.) As the court explained: "There is no inconsistency between disallowing a mistake of age defense when the victim is an actual minor and requiring a specific *intent* to induce a minor when the defendant unwittingly targets a police decoy. Nothing in subdivision (f) speaks to the latter intent requirement." (*Ibid.*)

In sum, there was no instructional error on the human trafficking charge.

2. *The Human Trafficking Conviction Is Supported by Substantial Evidence*

Middleton argues there was insufficient evidence to support her conviction under section 236.1, subdivision (c), for "attempt[ing] to cause, induce, or persuade[] a person who is a minor at the time of commission of the offense to engage in a commercial sex act[] with the intent to effect or maintain a violation of Section . . . 266h [pimping], 266i [pandering]."

In reviewing a challenge to the sufficiency of the evidence to support a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in

support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] . . . We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citations.] A reversal for insufficient evidence is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, quotation marks omitted.)

Middleton first argues the evidence is insufficient because there was no evidence presented whether Middleton had the requisite specific intent regarding Chelsea's age. As discussed, specific intent regarding the victim's age is not an element of the attempt prong of section 236.1, subdivision (c), when the victim actually is a minor. In any event, even if there were such a requirement, the sufficiency challenge would fail. Chelsea testified she told Middleton how old she was, and Middleton was present when Sangalang told Chelsea to lie about her age to potential customers.

Middleton next argues the evidence is insufficient to support a finding that Middleton acted with "the intent to effect or maintain" a violation of section 266i, which outlaws pandering. (See § 236.1, subd. (c) [person engages in human trafficking by attempting to induce a minor to engage in a commercial sex act "with the intent to effect or maintain a violation of Section . . . 266i"].) As the court instructed, in order to find the requisite intent to pander, the jury had to find that Middleton intended to use "promises, threats, violence or any device or scheme to cause, persuade, encourage, or induce Chelsea B. to become a prostitute, although the defendant's efforts need not have been successful,"

22

and that "[t]he defendant intended to influence Chelsea B. to be a prostitute." (See § 266i, subd. (a)(2).)

There is ample evidence to support a finding that Middleton intended to use "threats" or a "device or scheme" to persuade, encourage, or induce Chelsea to become a prostitute and that she intended to influence Chelsea to become a prostitute. Courts have interpreted those terms broadly. (*People v. Hashimoto* (1976) 54 Cal.App.3d 862, 866 [the language in section 266i is meant to "'cover all the various ramifications of the social evil of pandering and include them all in the definition of the crime, with a view of effectively combatting the evil sought to be condemned'"].) Viewed in the light most favorable to the judgment, the evidence shows Middleton attempted to persuade, encourage, or induce Chelsea to become a prostitute. Middleton educated Chelsea on the practices of street prostitution and made multiple affirmative attempts to facilitate Chelsea's engagement with potential clients. Middleton told Chelsea she had to have sex with Boles because she needed to lose her virginity before she could engage with commercial sex clients. She declined to assist Chelsea with calling her mother prior to the rape, and interacted with multiple potential clients on Chelsea's behalf, including taking the number of a man who flirted with Chelsea and telling him Chelsea would call him later.

After the sexual assault, Middleton supervised Chelsea closely. She took Chelsea to a street where commercial sex workers congregated and instructed her on how to attract and evaluate potential clients. She told Chelsea she should be able to make lots of money because so many cars had been honking at her, meaning they wanted to have sex with her. Then Middleton and Chelsea "walked the blade" together at different locations

23

with the goal of encountering clients to have sex with Chelsea for money. Middleton instructed Chelsea to pace back and forth in front of a certain car shop for potential clients to notice her. Middleton gave Chelsea condoms and instructed her to use them with clients.

The evidence is also sufficient to show Middleton used a device or scheme to induce Chelsea into sex work based on Middleton's entire course of conduct over the entire night, including by refusing to allow Chelsea to call her mother, by facilitating the rape by Boles, by withholding food until she made some money, and by keeping her under close watch during the night. Middleton makes no particular argument regarding the meaning of the words "device or scheme" and no particular argument that the evidence was insufficient to establish this element of the offense.

Middleton also argues the evidence was insufficient to support this charge because Middleton herself was a victim of trafficking and she was under the control of Sangalang and Boles. Middleton also contends evidence that she tried to comfort Chelsea both before and after the rape establishes that Middleton did not intend to pander Chelsea. Middleton is simply asking us to reweigh the evidence and to make different factual findings than the jury made. As to whether she was under the control of Sangalang and Boles, Middleton told investigators she worked for herself as a prostitute, not for Sangalang, Boles, or anyone else. As to the evidence Middleton tried to comfort Chelsea, the evidence is subject to conflicting inferences, and the jury could conclude the evidence supported the conclusion that Middleton was attempting to influence Chelsea by gaining her trust.

B.    *Conviction for Rape in Concert*

1.    *The Superior Court Did Not Err in Its Rape-in-concert Instructions*

Under section 264.1, subdivision (a), a defendant commits the crime of rape in concert "when the defendant, voluntarily acting in concert with another person, *by force or violence* and against the will of the victim, committed an act described in Section 261 . . . , either personally or by aiding and abetting the other person."  (Italics added.)

Section 261, subdivision (a)(2) provides in part:  "(a) Rape is an act of sexual intercourse accomplished under any of the following circumstances:  [¶] . . . (2) If it is accomplished against a person's will by means of *force, violence, duress, menace, or fear* of immediate and unlawful bodily injury on the person or another." (Italics added.)

The court instructed the jury on rape in concert using CALCRIM No. 1001, which provided in relevant part:  "Middleton is charged in Count Ten with committing rape by acting in concert in violation of Penal Code section 264.1.  [¶]  To prove that a defendant is guilty of this crime, the People must prove that:  [¶]  1. The defendant personally committed forcible rape and voluntarily acted with someone else who aided and abetted its commission;  [¶]  OR  [¶] 2. The defendant voluntarily aided and abetted someone else who personally committed forcible rape.  [¶]  To decide whether a defendant committed rape, please refer to the separate instruction that I have given you on that crime.  To decide whether a defendant aided and abetted rape, please refer to the separate instructions that I have given you on aiding and abetting.  You must apply those instructions

25

when you decide whether the People have proved rape in concert."

The separate instruction regarding rape was based on CALCRIM No. 1000.  It stated in part:

"Defendant Malcolm Boles is charged in Counts Two and Four with rape by force in violation of Penal Code section 261(a).  [¶]  To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  1. The defendant had sexual intercourse with a female;  [¶]  2. He and the female were not married to each other at the time of the intercourse;  [¶]  3. The female did not consent to the intercourse; AND  [¶]  4. The defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the female or to someone else. [¶] . . . .

"Intercourse is *accomplished by force* if a person uses enough physical force to overcome the female's will.

"*Duress* means a direct or implied threat of force, violence, danger or retribution that would cause a reasonable person to do something that she would not do otherwise.  When deciding whether the act was accomplished by duress, consider all the circumstances, including the female's age and her relationship to the defendant.

"*Retribution* is a form of payback or revenge.

26

"*Menace* means a threat, statement, or act showing an intent to injure someone.

"Intercourse is *accomplished by fear* if the female is actually and reasonably afraid."

Middleton did not object to these instructions and did not ask for a clarifying instruction.

Middleton argues that to convict her of rape in concert, the jury had to find Middleton aided and abetted Boles in raping Chelsea "by force or violence"; rape by means of duress, menace or fear is not enough. Middleton further argues that by directing the jury to CALCRIM No. 1000 to decide whether a defendant committed rape, the jury was improperly instructed that rape in concert could be based on a rape committed by means of duress, menace or fear.

As noted, the jury was instructed that to convict Middleton it had to find she "voluntarily aided and abetted someone else who personally committed forcible rape." The jury would understand from this that it had to find rape by force. In *Dearborne, supra,* 34 Cal.App.5th at p. 262, the court was faced with the same instructions that were used here and concluded there was no instructional error. As the court explained: "[T]he word 'force' does not have a technical legal meaning in this context, and is instead used in its ordinary sense. Accordingly, the court was only required to tell the jury that the rape had to be by force. It did so by telling the jury the rape had to be 'forcible.'" (*Ibid.*)

Further, as *Dearborne* concluded, to the extent the use of CALCRIM No. 1000 rendered the rape-in-concert instruction

"unclear or confusing," Middleton forfeited the argument by failing to object at trial. (*Dearborne, supra*, 34 Cal.App.5th at p. 262 ["A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal."].) We reach the same conclusion here: There was no instructional error.

But even if we were to construe the instructions as Middleton construes them, in order to find instructional error we would have to conclude a rape "accomplished against a person's will by means of . . . duress, menace, or fear of immediate and unlawful bodily injury on the person or another" as those terms are used in section 261, subdivision (a)(2), would not constitute a rape committed with "force or violence and against the will of the victim" under section 264.1, subdivision (a).

Although we need not resolve this issue here, we note there is strong support for the conclusion that a rape under section 261, subdivision (a)(2), is a rape committed with "violence." The Legislature has repeatedly stated rape under section 261, subdivision (a)(2), is a crime of violence under the law. For example, section 667.5 provides for "[e]nhancement of prison terms" for new "violent felonies" "because of prior prison terms." Subdivision (c) of that section provides: "The Legislature finds and declares that the following specified crimes merit special consideration when imposing a sentence to display society's condemnation for these *extraordinary crimes of violence* against the person." (Italics added.) "Violent felony" is defined to include rape in section 261, subdivision (a)(2), which again includes rapes "accomplished against a person's will by means of force, violence,

28

duress, menace, or fear of immediate and unlawful bodily injury on the person or another."  (§ 667.5, subd. (c).)

Many other statutes are in accord.  (See, e.g., Welf. & Inst. Code, § 6600, subd. (b) [A "[s]exually violent offense" is defined as a felony violation of section 261 (among other sections) "when committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person."]; § 667, subd. (e)(2)(C)(iv)(I) ["sexually violent offense" as defined in § 6600, subd. (b), is a super strike offense]; § 667, subd. (d)(1) [violation of section 261, subdivision (a)(2), is a "serious" and "violent" felony]; § 292 [for purposes of bail, a violation of section 261, subdivision (a)(2), "shall be deemed to be a felony offense involving an act of violence and a felony offense involving great bodily harm"].)  Given this, it would be anomalous to conclude a violation of section 261, subdivision (a)(2), does not constitute a violent rape for purposes of section 264.1.

The conclusion that a rape accomplished by means of "duress, menace, or fear of immediate and unlawful bodily injury" is no less a violent crime than a rape by "force" would also be consistent with reasoning in *People v. Griffin, supra,* 33 Cal.4th 1015.  There, the court held that "in order to establish force within the meaning of section 261, subdivision (2), the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the victim." (*Id.* at pp. 1023-1024, quotation marks and brackets omitted.)  "The gravamen of the crime of forcible rape is a sexual penetration *accomplished against the victim's will* by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. . . .  The Legislature has never sought to circumscribe the nature or type

29

of forcible conduct that will support a conviction of forcible rape, and indeed, the rape case law suggests that even conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction." (*Id.* at pp. 1027-1028.) Further, "'[b]ecause the fundamental wrong is the violation of a [person's] will and sexuality, the law of rape does not require that "force" cause physical harm. Rather, in this scenario, "force" plays merely a supporting evidentiary role, as necessary only to insure an act of intercourse has been undertaken against a victim's will.'" (*Id.* at p. 1025.) Force, duress, menace, and fear are alternative ways the will of the victim can be overcome; rape accomplished by any of these means is considered to be "forcible rape" under the law. (*Ibid.*) All are rapes involving violence.

We recognize this interpretation would render the word "force" in the phrase "force and violence" in section 264.1 redundant. Similarly, if all rapes accomplished by means of force, duress, menace, or fear were also rapes of violence, there would be no reason to include the word "violence" in section 261, subdivision (a)(2). (See § 261, subd. (a)(2) [forcible rape includes rape by "force, violence, duress, menace, or fear"].) In interpreting a statute, we attempt "[i]f possible" to give "significance . . . to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." (*People v. Cruz* (1996) 13 Cal.4th 764, 782, quotation marks omitted.) However, "'like all . . . interpretive canons, the canon against surplusage is a guide to statutory interpretation and is not invariably controlling." (*People v. Raybon* (2021) 11 Cal.5th 1056, 1070, fn. 10.) We will not apply the canon to defeat legislative intent, as gleaned from all relevant sources. (*Cruz,* at pp. 782-783.)

30

Again, we do not need to decide here (and do not decide) whether all forms of rape under section 261, subdivision (a)(2), would constitute rape by "force or violence" under section 264.1 because, as previously explained, we conclude the jury would have understood from CALCRIM No. 1001 it had to find rape by force.[2]  However, we encourage the Legislature to consider clarifying the language in section 264.1 to eliminate any possible ambiguity that rape under section 261, subdivision (a)(2), should be considered a violent rape for purposes of that statute.

In any event, any instructional error would have been harmless beyond a reasonable doubt.  Again, Middleton argues the jury was erroneously instructed it could convict her of rape in concert if it found she aided and abetted a rape by duress, menace, or fear as an alternative to finding she aided and abetted a rape by force or violence.  Even assuming the jury was so instructed and even assuming such an instruction was erroneous, it is clear beyond a reasonable doubt the jury would still have found Middleton guilty of rape in concert if it had been given only the "correct" instruction, which (according to Middleton) would have limited the definition of rape by force to only rape by force or violence.  (See *People v. Aledamat* (2019) 8 Cal.5th 1, 9, 13 [when a jury is instructed on two theories of guilt, one legally adequate and one legally inadequate, the standard of review in *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] applies]; *In re Lopez* (2023) 14 Cal.5th 562, 568.)

---

[2]     Given this, we do not address the cases Middleton relies on, *In re Jose M.* (1994) 21 Cal.App.4th 1470 and *People v. Mom* (2000) 80 Cal.App.4th 1217, disapproved on other grounds in *People v. Griffin, supra*, 33 Cal.4th at page 1028.

31

The evidence is overwhelming that the rape here was a rape by force; Middleton does not seriously contest that point. In convicting Middleton of rape in concert, the jury necessarily found that Middleton aided and abetted the rape that was actually committed, that is, a rape by force. There is no evidence the rape was committed by any means other than force. (*In re Lopez, supra*, 14 Cal.5th at p. 568 [In determining whether an alternate theory error is harmless under *Chapman v. California, supra*, 386 U.S. 18, "a reviewing court may hold the error harmless where it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability"].)

2. *The Rape-in-concert Conviction Is Supported by Substantial Evidence*

To be found guilty of rape in concert, a defendant must, while "voluntarily acting in concert with another person," commit the crime of rape "by force or violence and against the will of the victim," "either personally or by aiding and abetting the other person." (§ 264.1, subd. (a); *People v. Keovilayphone* (2005) 132 Cal.App.4th 491, 496 (*Keovilayphone*).) To find a defendant guilty of rape in concert on an aiding and abetting theory, the jury must find, beyond a reasonable doubt, (1) a perpetrator committed a rape by force or violence and against the will of the victim; (2) the defendant knew the perpetrator intended to commit the rape; (3) before or during the commission of the rape, the defendant intended to aid and abet the perpetrator in committing the crime; and (4) the defendant's words or conduct

32

did in fact aid and abet the perpetrator's commission of the rape. (CALCRIM No. 401; see also *Keovilayphone,* at p. 497.)

Middleton does not contest that Boles committed a rape by force or violence against Chelsea's will. Instead, she contends there is insufficient evidence to prove the other elements. There was substantial evidence that Middleton knew Boles intended to commit rape by force or violence. Middleton told Chelsea she had to have sex with either Boles or Sangalang, and Chelsea told her she did not want to do it. Middleton led Chelsea to the laundry room in her complex where she knew Sangalang and Boles were waiting. After the attack had begun, Chelsea ran from the laundry room in great distress and told Middleton she did not want to have sex with Boles. In Middleton's presence, Sangalang told Chelsea that Boles would be more gentle, making clear that Boles intended to continue the attack. Based on this evidence, the jury could find beyond a reasonable doubt that Middleton knew Boles intended to rape Chelsea by force or violence.

There is also substantial evidence Middleton intended to and did aid and abet the commission of the offense. Much of the same evidence that showed knowledge also constituted evidence that Middleton aided and abetted Boles, including that Middleton told Chelsea she had to have sex with Boles even though Chelsea did not want to do so; that Middleton led Chelsea into the laundry room where she knew Boles was waiting; and that Middleton walked Chelsea back into the laundry room after Chelsea had originally escaped, knowing Boles intended to continue the attack. Further, after the attack resumed, Middleton remained in the laundry room while Chelsea was raped and told Chelsea to be quiet because the people who lived in her apartment would hear her and call the police.

Middleton contends the evidence is insufficient to establish she acted voluntarily. Instead, she contends she "was also very much a victim of human trafficking and acted purely at the behest of the two codefendants with no personal motive or intent." "The word 'voluntarily' in section 264.1 means that the defendant acted freely of his own volition, and not accidentally, unintentionally or out of fear or coercion." (*Keovilayphone, supra*, 132 Cal.App.4th at p. 496.) "It follows that as long as the defendant acts (1) voluntarily and (2) in concert with others in committing an act of sexual intercourse against the victim's will by using force or violence, the elements of section 264.1 have been satisfied." (*Id.* at pp. 496-497.) There was sufficient evidence from which a reasonable jury could so find. As noted, Middleton stated in her police interview that she worked for herself as a prostitute, not for Sangalang or anyone else. Middleton points to no evidence that compels the conclusion that she did not act voluntarily; instead, the evidence Middleton cites is subject to conflicting inferences.

## DISPOSITION

The judgment of conviction is affirmed.


ESCALANTE, J.[*]

We concur:



PERLUSS, P. J.



SEGAL, J.

---

[*]    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.